857 A.2d 19

**STATE of Maryland**

v.

**Charles RAINES.**

**No. 129, Sept. Term, 2003.**

Court of Appeals of Maryland.

Aug. 26, 2004.

J. Joseph Curran, J., Atty. Gen. of Md., and Gary E. Bair, Sol. Gen., Baltimore, on brief, for appellant/cross-appellee.

Stephen B. Mercer (Rene Sandler, Sandler & Mercer, P.C., Rockville, William G. McLain, Washington, DC, on brief), for appellee/cross-appellant.

Marc Rotenberg, Chris Hoofnagle *, Marcia Hoffmann, Washington, DC, brief of amicus curiae Elec. Privacy Information Center; Timothy P. O'Toole *, Todd Cox, Alison Flaum, Jennifer Di Toro, Public Defender Service for the District of Columbia, Washington, DC, brief of amicus curiae, Public Defender Service for the District of Columbia in support of appellee, Charles Raines.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, Judge.

On August 21, 2003, Charles Raines, appellee, was indicted by a Montgomery County Grand Jury on the charges of first degree rape, second degree rape and robbery. On January

---

* Admitted in the State of Maryland.

29, 2004, the Circuit Court for Montgomery County, the motions court,[1] granted appellee's motion to suppress physical evidence because it found that the Maryland DNA[2] Collection Act, Md.Code (2003), § 2–501 *et. seq.*, of the Public Safety Article,[3] was in violation of the Fourth Amendment to the United States Constitution.

On February 20, 2004, the State of Maryland, appellant, filed an appeal to the Court of Special Appeals and a petition for writ of certiorari to this Court.[4] On March 2, 2004,

---

1. We shall also refer to this court as the "suppression court."

2. For a comprehensive review of DNA and DNA testing, see our case of *Armstead v. State*, 342 Md. 38, 673 A.2d 221 (1996), a case involving the admissibility of DNA evidence. Because Judge Raker's analysis in that case was so complete and comprehensive, we need not repeat it here. *See also*, another case authored by Judge Raker, *Gross v. State*, 371 Md. 334, 339–40 n. 1, 809 A.2d 627, 630 n. 1 (2002).

3. The Maryland DNA Collection Act first appeared in the Maryland Code in Article 88B, § 12A. *See* 1994 Md. Laws, Chap. 458.

4. The State filed its appeal pursuant to Md.Code (1973, 1998 Repl. Vol., 2003 Supp.), § 12–302(c) of the Courts and Judicial Proceedings Article, which states:

"(c) *Criminal case.*—In a criminal case, the State may appeal as provided in this subsection.

(1) The State may appeal from a final judgment granting a motion to dismiss or quashing or dismissing any indictment, information, presentment, or inquisition.

(2) The State may appeal from a final judgment if the State alleges that the trial judge:

(i) Failed to impose the sentence specifically mandated by the Code; or

(ii) Imposed or modified a sentence in violation of the Maryland Rules.

(3)(i) In a case involving a crime of violence as defined in § 14–101 of the Criminal Law Article, and in cases under §§ 5–602 through 5–609 and §§ 5–612 through 5–614 of the Criminal Law Article, the State may appeal from a decision of a trial court that excludes evidence offered by the State or requires the return of property alleged to have been seized in violation of the Constitution of the United States, the Constitution of Maryland, or the Maryland Declaration of Rights.

(ii) The appeal shall be made before jeopardy attaches to the defendant. However, in all cases the appeal shall be taken no more

**4**

appellee filed a conditional cross-petition. This Court granted both petitions on March 11, 2004. *State v. Raines*, 380 Md. 230, 844 A.2d 427 (2004). We issued our order and mandate, with opinion to follow, reversing the trial court's granting of the motion to suppress. We now explain our decision.

The sole question presented by the State for our review asks:

"Did the suppression court err in ruling that the Maryland DNA Collection Act is unconstitutional as violative of the Fourth Amendment?"

In addition to a variation of the State's question, appellee's cross-petition asks:

"Did the suppression court err in ruling that the Maryland DNA collection statute was not a penal statute in violation

than 15 days after the decision has been rendered and shall be diligently prosecuted.

(iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.

(iv) If the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken. In that case, the State may not prosecute the defendant on those specific charges or on any other related charges arising out of the same incident.

(v) Pending the prosecution and determination of an appeal taken under paragraph (1) or (3) of this subsection, the defendant shall be released on personal recognizance bail. If the defendant fails to appear as required by the terms of the recognizance bail, the trial court shall subject the defendant to the penalties provided in § 5–211 of the Criminal Procedure Article.

(vi) If the State loses the appeal, the jurisdiction shall pay all the costs related to the appeal, including reasonable attorney fees incurred by the defendant as a result of the appeal."

Pursuant to § 12–302(c)(3)(iii) of this statute, the State's "appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court." *Id.* In the case *sub judice*, as the record was filed on March 18, 2004, the decision was required to be decided by July 16, 2004. It was decided on July 13, 2004.

of the *ex post facto* clauses of the federal and state constitutions, as applied to the appellee?"

We hold that the Maryland DNA Collection Act (hereinafter, "the Act") is constitutional and does not violate the Fourth Amendment or the *Ex Post Facto* Clauses of the United States and Maryland Constitutions. Accordingly, we reverse the suppression court's order granting the motion to suppress. We agree that its decision regarding the *Ex Post Facto* clauses of the federal and state constitutions was correct.

## I. Facts

At approximately 12:00 a.m. on July 14, 1996, the victim was walking home from the Wheaton Plaza area on Viers Mill Road in Montgomery County when she was grabbed from behind, choked to the point of unconsciousness and dragged into a dark area between two neighborhood houses. The assailant pulled her jacket over her head, took her pants off, placed the pants over her eyes as a blindfold and proceeded to rape her several times. The assailant additionally robbed the victim of $150. She gave a description of her attacker which described him as a black male smelling of cigarette smoke, who was approximately five feet eight inches tall and possibly with facial hair.

The police recovered some evidence at the scene of the attack. A sexual examination of the victim was performed at Shady Grove Adventist Hospital and, using vaginal swabs, semen was recovered from the victim. A subsequent laboratory analysis of the semen produced a DNA profile of the attacker. The authorities, however, were unable to identify a suspect even after the discovery of this evidence and an extensive police investigation.

Pursuant to the Maryland DNA Collection Act, on November 8, 1999, appellee, who was incarcerated,[5] had the inside of

---

**5.** Appellee's conviction that qualified him for DNA collection under the Act was a 1982 robbery conviction, which occurred prior to the Act being enacted in 1994. On November 8, 1999, when appellee submit-

his cheek swabbed [6] so the State could obtain a DNA [7] sample [8] to be submitted to the Maryland DNA data bank.[9] In October of 2002, the DNA profile of the victim's 1996 attacker was submitted to the Maryland DNA data bank for comparison in order to discover the identity of her attacker. The attacker's profile matched the DNA profile from appellee's November 8th cheek swab.

As the Act provides, this match resulted in probable cause to obtain another DNA sample from appellee. In February of 2003, the State secured a search warrant for the purpose of

---

ted a DNA sample pursuant to the Act, he was incarcerated for another crime unrelated to the 1982 robbery conviction.

6. We shall also refer to this process of obtaining DNA as a buccal swab.

7. Section 2–501(e) states that " 'DNA' means deoxyribonucleic acid," which is a self-replicating material that makes up chromosomes and is the carrier of genetic information in all living organisms. Excluding identical twins, DNA is unique to each person.

8. Section 2–501(g) defines a "DNA sample" as follows:
 "(g) *DNA sample.*—'DNA sample' means a body fluid or tissue sample that is:
 (1) provided by an individual who is convicted of a felony or a violation of § 6–205 or § 6–206 of the Criminal Law Article; or
 (2) submitted to the statewide DNA data base system for analysis as part of a criminal investigation."
 After the physical DNA sample is taken by swab, then appropriate tests are run on that sample in order to obtain the DNA record, *i.e.*, profile. Section 2–501(f) defines the term "DNA record." It states:
 "(f) *DNA record.*—(1) 'DNA record' means DNA information stored in CODIS [the Federal Bureau of Investigation's Combined DNA Index System, as defined in § 2–501(b) of the Act] or the statewide DNA data base system.
 (2) 'DNA record' includes the information commonly referred to as a DNA profile." [Alteration added.]

9. The Act defines the statewide DNA data base system as, "the DNA record system administered by the Department for identification purposes." § 2–501(h). The DNA data bank keeps the records of results, *i.e.*, DNA profiles, obtained from the analysis of the DNA samples. The DNA profiles are then compared to the profiles of DNA samples from evidence obtained from victims, human remains and the like, in an effort to identify the evidentiary sample. After a profile is obtained pursuant to the Act, the actual DNA sample is stored in the Statewide DNA repository, which "means the State repository of DNA samples collected under this subtitle." § 2–501(i).

obtaining a saliva sample from appellee for a second DNA profile. This February 2003 DNA profile of appellee produced a second match to the DNA profile of the victim's attacker. After the second match between appellee's DNA and the attacker's DNA was made, the statistical probability of anyone other than appellee being the source of the DNA of the attacker was determined to be one in six billion.

On August 21, 2003, as a result of these DNA profile matches and the victim's testimony, appellee was indicted by a Montgomery County Grand Jury on the charges of first degree rape, second degree rape and robbery. Appellee filed a motion to suppress the DNA evidence obtained from him in February of 2003 because of his belief that the procedure used to obtain the November 8, 1999 DNA sample (which lead to the DNA profile match constituting the probable cause for the search warrant that produced the latter DNA sample) was unconstitutional. On January 28, 2004, the motions court, without a hearing, granted appellee's motion to dismiss, stating that the collection of appellee's DNA in 1999 and 2003 violated his Fourth Amendment right to be free from unreasonable searches and seizures. The suppression court relied on the United States Supreme Court cases of *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), and *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), in finding that appellee's legitimate expectation of privacy was violated in 1999 because the State had no "probable cause or individualized suspicion to justify a search that unquestionably is to advance the general needs of law enforcement."

## II. Discussion

While several other states have decided issues similar to that in the case *sub judice*, this is the first time in which this Court has addressed the constitutionality of Maryland's DNA collection statute. The central issue dealing with the constitutionality of the Act is whether the collection of DNA from a certain class of convicted persons is in accord with the protections of the Fourth Amendment of the United States Constitu-

8

tion to be free from unreasonable searches and seizures. Appellee also challenges the Act as being in violation of the *Ex Post Facto* clauses of the federal constitution and the State declaration of rights.

## A. Fourth Amendment

The Fourth Amendment of the United States Constitution protects individuals from unreasonable government searches and seizures, and it guarantees:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

These guaranteed Fourth Amendment protections are applicable to the State of Maryland through the Fourteenth Amendment of the United States Constitution. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961); *Owens v. State,* 322 Md. 616, 622, 589 A.2d 59, 61, *cert. denied,* 502 U.S. 973, 112 S.Ct. 452, 116 L.Ed.2d 470 (1991).

In the last fifteen years, state governments began to enact DNA collection statutes, and currently all fifty states and the federal government, *see* 42 U.S.C. §§ 14131–34, have some type of DNA collection statute that requires some or all convicted felons to submit a tissue sample, either blood, saliva or other tissue, for DNA profile analysis and storage in a DNA data bank. *See* Michelle Hibbert, *DNA Databanks: Law Enforcement's Greatest Surveillance Tool?,* 34 Wake Forest L.Rev. 767, 771 n. 12 (1999) (citing all state statutes); *Landry v. Attorney General,* 429 Mass. 336, 709 N.E.2d 1085, 1087 (1999); *see also* Robin Cheryl Miller, *Validity, Construction, and Operation of State DNA Database Statutes,* 76 A.L.R.5th 239 (2000) (citing to several state DNA collection statutes).

Specific to the case *sub judice,* the Maryland DNA Collection Act is located within Title 2, Subtitle 5 of the Public

Safety Article of the Maryland Code. The initial provisions of the Act set up the regulatory scheme, identify the classes of persons subject to the Act and establish the procedures and purposes of the Act. After defining terms in § 2–501, the Act focuses on the creation of a statewide regulatory DNA data base system, including the establishment of the Office of Director. Md.Code (2003), § 2–502 of the Public Safety Article.[10] It then calls for the Director and Secretary of the State Police to consult with each other in reference to adopting

---

**10.** Hereinafter, unless specifically noted otherwise, all statutory references are to Title 2, subtitle 5 of the Public Safety Article of the Maryland Code.

Specifically, § 2–502, the establishment of the statewide DNA data base system, states:

" **§ 2–502. Statewide DNA data base system.**

(a) *Established.*—There is a statewide DNA data base system in the Crime Laboratory.

(b) *Purpose.*—The statewide DNA data base system is the central repository for all DNA testing information as provided in this subtitle.

(c) *Duties of Director.*—The Director shall:

(1) administer and manage the statewide DNA data base system;

(2) consult with the Secretary on the adoption of appropriate regulations for protocols and operations of the statewide DNA data base system;

(3) ensure compatibility with Federal Bureau of Investigation and CODIS requirements, including the use of comparable test procedures, quality assurance, laboratory equipment, and computer software;

(4) ensure the security and confidentiality of all records in the statewide DNA data base system; and

(5) provide for a liaison with the Federal Bureau of Investigation and other criminal justice agencies related to the State's participation in CODIS or in any DNA data base designated by the Department.

(d) *Duties of Crime Laboratory.*—The Crime Laboratory shall:

(1) receive DNA samples for analysis, classification, storage, and disposal;

(2) file the DNA record of identification characteristic profiles of DNA samples submitted to the Crime Laboratory; and

(3) make information that relates to DNA samples and DNA records available to other agencies and individuals as authorized by this subtitle.

(e) *Contract with DNA laboratory.*— The Director may contract with a qualified DNA laboratory to complete DNA typing analyses if the laboratory meets the guidelines established by the Director.

(f) *Record retention.*—Subject to § 2–511 of this subtitle, records of testing shall be permanently retained on file at the Crime Laboratory."

appropriate regulations for the administration of the system in addition to several other required regulations. § 2–503. The procedures for the collection of DNA samples are set out in § 2–504 of the Act as follows:

"**§ 2–504. Collection of DNA samples.**

(a) *In general.*—(1) In accordance with regulations adopted under this subtitle, and if adequate funds for the collection of DNA samples are appropriated in the State budget, an individual who is convicted of a felony or a violation of § 6–205 or § 6–206 of the Criminal Law Article shall:

(i) have a DNA sample collected on intake to a correctional facility, if the individual is sentenced to a term of imprisonment; or

(ii) provide a DNA sample as a condition of sentence or probation, if the individual is not sentenced to a term of imprisonment.

(2) If adequate funds for the collection of DNA samples are appropriated in the State budget, an individual who was convicted of a felony or a violation of § 6–205 or § 6–206 of the Criminal Law Article on or before October 1, 2003 and who remains confined in a correctional facility on or after October 1, 1999, shall submit a DNA sample to the Department.

(b) *Place of collection.*—In accordance with regulations adopted under this subtitle, each DNA sample required to be collected under this section shall be collected:

(1) at the correctional facility where the individual is confined, if the individual is confined in a correctional facility on or after October 1, 2003, or is sentenced to a term of imprisonment on or after October 1, 2003; or

(2) at a facility specified by the Director, if the individual is on probation or is not sentenced to a term of imprisonment.

(c) *Authorized collectors.*—A DNA sample shall be collected by an individual who is:

(1) appointed by the Director; and

(2) trained in the collection procedures that the Crime Laboratory uses.

(d) *Second DNA sample.*—A second DNA sample shall be taken if needed to obtain sufficient DNA for the statewide DNA data base or if ordered by the court for good cause shown.

(e) *Failure to provide DNA sample.*—Failure of an individual who is not sentenced to a term of imprisonment to provide a DNA sample within 90 days after notice by the Director is a violation of probation."

The act additionally outlines its purposes in § 2–505, which states:

"§ 2–505. **Purpose of collecting and testing DNA samples.**

(a) *In general.*—To the extent fiscal resources are available, DNA samples shall be collected and tested:

(1) to analyze and type the genetic markers contained in or derived from the DNA samples;

(2) as part of an official investigation into a crime;

(3) to help identify human remains;

(4) to help identify missing individuals; and

(5) for research and administrative purposes, including:

(i) development of a population data base after personal identifying information is removed;

(ii) support of identification research and protocol development of forensic DNA analysis methods; and

(iii) quality control.

(b) *Limitations on DNA records.*—(1) Only DNA records that directly relate to the identification of individuals shall be collected and stored.

(2) DNA records may not be used for any purposes other than those specified in this subtitle."

The remaining provisions of the Act establish several protections to the individuals whose DNA is collected and stored pursuant to the Act's previous provisions. Sections 2–506 through 2–508 discuss the DNA storage, proficiency testing of

the DNA test analysts, the availability of the DNA profile and the creation of a population data base from the DNA profile only after all personal identifiers are removed from the profiles. Section 2–510 states that any DNA match provides only probable cause "to obtain an additional DNA sample from the subject." Section 2–511 allows for the removal of an individual's DNA information and sample from the system where the individual fits the expungement criterion of the Code. Finally, the last section in the Act, § 2–512, provides for punishment with respect to any person who discloses or obtains DNA information from the data bank illegally.

Several DNA collection statutes across the country that are similar to Maryland's Act, including the federal statute, have been challenged and nearly every challenge has been unsuccessful. At the time of argument, the lone appellate court we were able to find that struck down a DNA collection statute as violative of the Fourth Amendment was the United States Court of Appeals for the Ninth Circuit. *United States v. Kincade,* 345 F.3d 1095 (9th Cir.2003). The entire Ninth Circuit court, however, vacated its 3–judge panel *Kincade* opinion and designated it for an en banc rehearing in an order stating:

> "Upon the vote of a majority of nonrecused regular active judges of this court, it is ordered that this case be reheard by the en banc court pursuant to Circuit Rule 35–3. The three-judge panel opinion *shall not be cited as precedent by or to this court or any district court of the Ninth Circuit,* except to the extent adopted by the en banc court."

*United States v. Kincade,* 354 F.3d 1000 (9th Cir.2004) (emphasis added). As the Ninth Circuit en banc panel has specifically stated that the opinion "shall not be cited as precedent" in the Ninth Circuit itself, and that court has yet to issue a final decision, the *Kincade* opinion has little persuasive value in this Court. Appellee's reliance on that case is misplaced.

Contrary to appellee's reliance on *Kincade,* every other appellate court we have found dealing with the issue has

upheld the DNA collection statute at issue before it. *Roe v. Marcotte*, 193 F.3d 72, 76–82 (2d Cir.1999) (upholding a Connecticut DNA collection law); *Jones v. Murray*, 962 F.2d 302, 305–08 (4th Cir.) (upholding a Virginia DNA collection law), *cert. denied*, 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992); *Groceman v. United States Dep't of Justice*, 354 F.3d 411, 413–14 (5th Cir.2004) (per curiam) (upholding the federal DNA collection law); *Velasquez v. Woods*, 329 F.3d 420, 421 (5th Cir.2003) (per curiam)(upholding the Texas DNA collection law); *Green v. Berge*, 354 F.3d 675, 677–79 (7th Cir.2004) (upholding the Wisconsin DNA collection law); *Rise v. Oregon*, 59 F.3d 1556, 1559–62 (9th Cir.1995) (upholding the Oregon DNA collection law prior to the Supreme Court cases in *Edmond* and *Ferguson* and the Ninth Circuit's *Kincade* opinion, which, although it impliedly overruled *Rise*, subsequently was vacated by the Ninth Circuit, that, as stated previously, has yet to render a decision on rehearing en banc), *cert. denied*, 517 U.S. 1160, 116 S.Ct. 1554, 134 L.Ed.2d 656 (1996); *United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir.2003) (upholding the federal DNA collection law), *cert. denied*, 540 U.S. 1083, 124 S.Ct. 945, 157 L.Ed.2d 759 (2003); *Shaffer v. Saffle*, 148 F.3d 1180, 1181–82 (10th Cir.1998) (upholding the Oklahoma DNA collection law); *Schlicher v. Peters*, 103 F.3d 940, 943 (10th Cir.1996) (upholding the Kansas DNA collection law); *Boling v. Romer*, 101 F.3d 1336, 1339–40 (10th Cir.1996) (upholding the Colorado DNA collection law); *In the Matter of the Appeal in Maricopa Juvenile Action Nos. JV–512600 and JV–512797*, 187 Ariz. 419, 930 P.2d 496, 500–01 (1996); *Alfaro v. Terhune*, 98 Cal.App.4th 492, 505–06, 120 Cal.Rptr.2d 197 (Cal.App.2002), *cert. denied*, 537 U.S. 1136, 123 S.Ct. 922, 154 L.Ed.2d 828 (2003); *People v. Calahan*, 272 Ill.App.3d 293, 208 Ill.Dec. 532, 649 N.E.2d 588, 591–92 (1995); *State v. Martinez*, 276 Kan. 527, 78 P.3d 769, 773–76 (2003); *Landry v. Attorney General*, 429 Mass. 336, 709 N.E.2d 1085, 1091–92 (1999); *Gaines v. State*, 116 Nev. 359, 998 P.2d 166, 171–73 (2000), *cert. denied*, 531 U.S. 856, 121 S.Ct. 138, 148 L.Ed.2d 90 (2000); *Cooper v. Gammon*, 943 S.W.2d 699, 704–05 (Mo.App.1997); *State v. Steele*, 155 Ohio

App.3d 659, 802 N.E.2d 1127, 1132–37 (2003); *State ex rel. Juvenile Dep't v. Orozco*, 129 Or.App. 148, 878 P.2d 432, 435–36 (1994); *Dial v. Vaughn*, 733 A.2d 1, 6–7 (Pa.Cmwlth.1999); *In re D.L.C.*, 124 S.W.3d 354, 363–68 (Tex.App.2003); *Johnson v. Commonwealth*, 259 Va. 654, 529 S.E.2d 769, 779 (Va.), *cert. denied*, 531 U.S. 981, 121 S.Ct. 432, 148 L.Ed.2d 439 (2000); *State v. Olivas*, 122 Wash.2d 73, 856 P.2d 1076, 1080–86 (1993); *Doles v. State*, 994 P.2d 315, 318–19 (Wyo.1999); *see also*, some federal district courts which have upheld state DNA collection laws, *Padgett v. Ferrero*, 294 F.Supp.2d 1338, 1342–44 (N.D.Ga.2003) (upholding the Georgia DNA collection law); *Kruger v. Erickson*, 875 F.Supp. 583, 588–89 (D.Minn.1995) (upholding the Minnesota DNA collection law).

Appellee nonetheless argues that the Fourth Amendment proscribes searches similar to the one pursuant to the Act in this case. Appellee, relying on the two Supreme Court cases, *City of Indianapolis v. Edmond, supra*, and *Ferguson v. City of Charleston, supra*, contends that a search cannot satisfy the reasonableness requirement of the Fourth Amendment where the DNA was seized without any individualized suspicion of criminal conduct. Appellee also argues that the search allowed under the Act cannot fall into the special needs doctrine because he contends that the primary purpose of the Act is to assist in the prosecution of crimes.

While the State concedes that the buccal swab for appellee's DNA conducted pursuant to the Act is a search for Fourth Amendment purposes, it contends that such a search is constitutional for two independent reasons. First, the State, citing *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), argues that the act is consistent with the Fourth Amendment's totality of the circumstances test, which assesses the reasonableness of a Fourth Amendment intrusion by balancing the degree of the government's intrusion upon the individual's expectation of privacy against the promotion of the government's legitimate interest. The State believes that the government intrusion in this case was minimal, as appellee, a incarcerated felon, had a diminished expectation of

privacy, while the legitimate government interest in properly identifying individuals and protecting the public was served. Alternatively, the State contends that the Act is constitutional pursuant to the special needs exception to the Fourth Amendment, because the collection of "DNA from convicted offenders and storing their DNA profiles serves special law enforcement interests."

In light of the overwhelming precedent upholding the constitutionality of DNA collection statutes and the reasonableness of such searches, and upon our own independent assessment, we hold that the Maryland DNA Collection Act does not violate the Fourth Amendment and that the Act in the case *sub judice* is constitutional. As we hold that the Act and the buccal swab conducted under it were reasonable under the Fourth Amendment, we need not address whether the Act falls into the special needs exception to the Fourth Amendment.

### B. Reasonableness

The courts that uphold DNA collection statutes generally do so because they hold that such searches are reasonable ones. The Fourth Amendment to the United States Constitution specifically protects only "against *unreasonable* searches and seizures" (emphasis added). Thus, the Supreme Court has said:

"The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' *Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)."

*Knights,* 534 U.S. at 118–19, 122 S.Ct. at 591, 151 L.Ed.2d 497.

In balancing the reasonableness of a warrantless search, of a probationer's home, the *Knights* Court focused on the lessened expectation of the probationer and that such persons enjoy less liberty than that of ordinary citizens. *Knights,* 534

U.S. at 119, 122 S.Ct. at 591, 151 L.Ed.2d 497. In assessing the governmental interest in the warrantless search of Knights' home, the Supreme Court said:

"[I]t must be remembered that 'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.' *Griffin,* 483 U.S., at 880, 107 S.Ct. 3164, 97 L.Ed.2d 709. The recidivism rate of probationers is significantly higher than the general crime rate. See U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, Recidivism of Felons on Probation, 1986–89, pp. 1, 6 (Feb. 1992) (reporting that 43% of 79,000 felons placed on probation in 17 States were rearrested for a felony within three years while still on probation); U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, Probation and Parole Violators in State Prison, 1991, p. 3 (Aug. 1995) (stating that in 1991, 23% of state prisoners were probation violators). And probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply, see *Minnesota v. Murphy,* 465 U.S. 420, 435, n. 7, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) ('[T]here is no right to a jury trial before probation may be revoked'); 18 U.S.C. § 3583(e).

"The State has a dual concern with a probationer. On the one hand is the hope that he will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community. The view of the Court of Appeals in this case would require the State to shut its eyes to the latter concern and concentrate only on the former. But we hold that the Fourth Amendment does not put the State to such a choice. Its interest in apprehending violators of the

criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen."

*Id.* at 120–21, 122 S.Ct. at 592, 151 L.Ed.2d 497 (alteration added). That Court then went on to hold that the severe intrusion into the privacy of the home of probationer was justified because of the reasonableness of the intrusion in light of Knights' lessened expectation of privacy and the officer's reasonable suspicion in respect to the search.

Appellee contends that the *Knights* case stands for the proposition that some type of individualized suspicion is always required for a search to be reasonable. The main problem with that argument is that it precludes further balancing on different facts. *Knights* dealt with an intrusion that has long been held to be "the chief evil against which the wording of the Fourth Amendment is directed"—the search of a private home. *United States v. United States Dist. Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). The proposition for which *Knights* stands is not a *per se* individualized suspicion requirement. The case merely used a balancing test involving what is generally considered to be a specially offensive type of government intrusion. Such a balancing test necessarily precludes any *per se* rule because the test is dependent on the specific circumstances of *each* individual case. Even in light of such an intrusion, the Court held that the warrantless search was justified even when there was a low level of suspicion where a person's expectation of privacy is diminished and the government interest was strong and legitimate. Under *Knights,* we see no reason why a search cannot be reasonable absent an individualized suspicion in the limited circumstances of this case, where the individual's expectation of privacy was even more limited than in *Knights,* the government intrusion, a buccal swab, was minimal at most and the government objective is as strong as in *Knights.* Here, appellee was not on probation living in his own home—he was incarcerated. The government intrusion was not an unauthorized entry into a private home, but a buccal swab of the cheek lasting a few seconds. Finally, the

legitimate government interest was in establishing a more accurate method to identify recidivists for several purposes, while the officers in the *Knights* case actually were searching for evidence of a crime. Requiring individualized suspicion to obtain DNA for future use would negate the very purpose of the Act itself, considering that the Act does not seek to obtain evidence, but to merely identify persons. Balancing these factors illustrates the reasonableness of the minimal intrusion of a buccal swab in light of the profound public interest in identifying the perpetrators of crimes.[11]

Even prior to the *Knights* case, the United States Court of Appeals for the Fourth Circuit, in *Jones v. Murray*, 962 F.2d 302 (4th Cir.1992), upheld a Virginia DNA collection statute where the method—the taking of blood—was more intrusive than a buccal swab. The Fourth Circuit stated:

"[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it. We accept this proposition because the identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes. This becomes readily apparent when we consider the universal approbation of 'booking' procedures that are followed for every suspect arrested for a felony, whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification. Thus a tax evader is fingerprinted just the same as is a burglar. While we do not accept even this small level of intrusion for free persons without Fourth Amendment constraint, *see Davis v. Mississippi*, 394 U.S. 721, 727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), the same protec-

---

11. In addition, the Act does not constitute the gathering of direct evidence of a crime. The DNA evidence of the crime already exists prior to the match of any DNA profile in the data bank. The Act does not create direct evidence; the direct evidence is the semen acquired by a vaginal swab of the victim. The Act merely serves to identify the perpetrator similar to the way investigators have used fingerprints for many years.

tions do not hold true for those lawfully confined to the custody of the state. As with fingerprinting, therefore, we find that the Fourth Amendment does not require an additional finding of individualized suspicion before blood can be taken from incarcerated felons for the purpose of identifying them."

*Jones,* 962 F.2d at 306–07 (alteration added). In a footnote directly following the above text, the Fourth Circuit stated:

"Because we consider the cases which involve the Fourth Amendment rights of prison inmates to comprise a separate category of cases to which the usual per se requirement of probable cause does not apply, there is no cause to address whether the so-called 'special needs' exception, relied on by the district court, applies in this case. *We do, however, find support for our holding in the fact that the Supreme Court has not categorically required individualized suspicion in the case of every search which advances a law enforcement objective.* Only recently it concluded that a 'slight' or 'minimal' intrusion caused by the short stop of an automobile at a checkpoint, although directed at a class of people without individualized suspicion, may be justified as reasonable under the Fourth Amendment by a weightier interest advanced by the search. *See Michigan Dep't Of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 2488, 110 L.Ed.2d 412 (1990) (approving use of sobriety checkpoint to deter drunk driving)."

*Id.* at 307 n. 2 (emphasis added). That court went on to conclude the following where the Virginia statute called for the more intrusive taking of blood to obtain a DNA sample:

"*The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.*

"*Thus, in the case of convicted felons who are in custody of the Commonwealth, we find that the minor intrusion*

*caused by the taking of a blood sample is outweighed by Virginia's interest, as stated in the statute, in determining inmates' 'identification characteristics specific to the person' for improved law enforcement. See* Va.Code Ann. § 19.2–310.2.

. . .

". . . [G]iven the DNA technology that is currently available, . . . Virginia's interest in DNA testing is significantly more compelling with regard to those felons convicted of violent crimes than those not. However, we note that the fact that fingerprints are not found at a particular crime scene does not negate the Commonwealth's interest in fingerprinting the criminal suspect when caught. There may be uses for DNA technology other than merely verifying a suspect's presence at the scene of a crime. As we have noted, a DNA print might be used to identify a criminal suspect who has attempted to alter or conceal his or her identity. Moreover, if DNA technology becomes more common (and particularly if it is established as a reliable and judicially accepted identification tool), then it is likely that law enforcement officials will become more aware of the technology and thus more likely to make use of the DNA clues that are left as a result of crimes other than murder or rape. The effectiveness of the Commonwealth's plan, in terms of percentage, need not be high where the objective is significant and the privacy intrusion limited. *See Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 2487, 110 L.Ed.2d 412 (1990) (validating state use of roadblock to discover drunk drivers despite resulting arrest rate of only 1.5%); *Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884 (validating body cavity search of pretrial detainees despite only one instance in which an inmate was discovered attempting to smuggle contraband).

"It is not for us to weigh the advantages of one method of identification over another which is selected by the Commonwealth. *While greater utility for use of DNA data can be supposed when the future crime is one of violence and those crimes can statistically be related more directly to*

*inmates now incarcerated for crimes of violence, the utility of more exact identification in all cases still justifies the minor intrusion.* We therefore agree with the district court's conclusion that § 19.2–310.2 does not violate the Fourth Amendment as applied by the Fourteenth Amendment to the Commonwealth of Virginia."

*Id.* at 307–08 (emphasis added) (alteration added). *See also United States v. Stegman,* 295 F.Supp.2d 542, 548–50 (D.Md. 2003) (the District Court, finding, relying on *Jones* and distinguishing *Edmond* and *Ferguson,* that the federal DNA collection act did not violate the Fourth Amendment).

The Fourth Circuit's reasoning in *Jones* is applicable in this case. More important, the Supreme Court's upholding of the major home intrusion, in the case of probationers in *Knights,* serves to strengthen the use of the balancing test involving a much more minimal intrusion in the Fourth Circuit's *Jones* case. The present case is even stronger as the minimal buccal swab is less of an intrusion than both the home invasion in *Knights* and the blood sample in *Jones,* while the other factors involved in the balancing test are very similar, if not identical, to that in *Jones.* Given the compelling governmental interest in identifying persons involved with crimes, accident victims, "John Doe" bodies, and the minimal intrusion in respect to appellee, the taking of a DNA sample by buccal swab pursuant to the Act in the case *sub judice* is a reasonable search under the Fourth Amendment.

Appellee argues that the *Jones* holding, and the holdings of other similar cases decided prior to 2001, are meaningless in light of the Supreme Court cases in *City of Indianapolis v. Edmond, supra,* and *Ferguson v. City of Charleston, supra.* First, several courts, including the United States Court of Appeals for the Fifth Circuit, have distinguished *Edmond* and *Ferguson* in upholding DNA collection acts. In *Groceman v. United States Department of Justice,* 354 F.3d 411 (5th Cir. 2004) (per curiam), the Fifth Circuit, citing *Jones,* upheld the federal DNA collection statute, stating that "collection of DNA from prisoners under the DNA Act is reasonable under the Fourth Amendment." *Id.* at 413. That Court relied on its

prior opinion in *Velasquez v. Woods*, 329 F.3d 420 (5th Cir. 2003) (per curiam), in holding that the DNA collection is reasonable in light of the minimal intrusion, an inmate's diminished expectation of privacy and the legitimate government interest.

Additionally, both *Edmond* and *Ferguson* are distinguishable on their facts from the DNA collection context for two reasons. First, the *Edmond* and *Ferguson* cases involved searches of ordinary citizens without individualized suspicion, not incarcerated criminals. Second, the primary purpose of the government actions in those cases was not to identify individuals, but to gather evidence of crimes, thus acting like a general warrant.

In *Edmond*, the Supreme Court struck down a City of Indianapolis vehicle checkpoint policy as being in violation of the Fourth Amendment.[12] The checkpoint program's primary purpose was designed to discover illegal narcotics and was instituted by the seizure and search of all citizens at the checkpoints. The Supreme Court stated that it had "never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing" and that its checkpoint cases only recognized limited exceptions to the general individualized suspicion rule, which approved checkpoints primarily designed to serve purposes related to border control or safety concerns—not evidence gathering. *Edmond*, 531 U.S. at 41, 121 S.Ct. at 454, 148 L.Ed.2d 333. In holding the Indianapolis program unconstitutional, the Court said:

"The primary purpose of the Indianapolis narcotics checkpoints is in the end to advance 'the general interest in crime

---

12. In outlining the standard for its Fourth Amendment analysis, the Supreme Court stated that a "search or seizure *is ordinarily* unreasonable in the absence of individualized suspicion of wrongdoing. While such suspicion is not an 'irreducible' component of reasonableness, we have recognized only limited circumstances in which the usual rule does not apply." *Edmond*, 531 U.S. at 37, 121 S.Ct. at 451, 148 L.Ed.2d 333 (citations omitted) (emphasis added). *Edmond*, therefore, unlike the contention of appellee, clearly does not stand for the proposition that all searches must require an individualized suspicion.

control.' We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime."

*Id.* at 44, 531 U.S. 32, 121 S.Ct. at 455, 148 L.Ed.2d 333 (citation omitted).

Recently, the Supreme Court, in *Illinois v. Lidster*, 540 U.S. 419, 423, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004), recognized the constitutional validity of a checkpoint program whose primary law enforcement purpose was not in unearthing incriminating evidence in those who are subjected to the stop, but to ask for assistance in solving a crime from the public. In addressing the importance of the purpose of the seizure and confirming the lack of an automatic rule requiring individualized suspicion, the Court said:

"The checkpoint stop here differs significantly from that in *Edmond*. The stop's primary law enforcement purpose was *not* to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others. The police expected the information elicited to help them apprehend, not the vehicle's occupants, but other individuals.

"*Edmond's* language, as well as its context, makes clear that the constitutionality of this latter, information-seeking kind of stop was not then before the Court. *Edmond* refers to the subject matter of its holding as 'stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that *any given motorist has committed some crime.*' *Ibid.* (emphasis added). We concede that *Edmond* describes the law enforcement objective there in question as a 'general interest in crime control,' but it specifies that the phrase 'general interest in crime control' does not refer to every 'law enforcement' objective. *Id.*, at 44, n. 1, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333.

We must read this and related general language in *Edmond* as we often read general language in judicial opinions—as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering."

*Id.* at 424, 124 S.Ct. at 889, 157 L.Ed.2d 843.

In *Ferguson v. City of Charleston, supra,* the Supreme Court overturned non-consensual urine drug tests performed by hospitals on pregnant women in the general population, who met certain symptomatic criteria. It did not involve convicted or incarcerated felons. The women were regular maternity patients and did not know the samples were being used to develop evidence of drug use. The admitted aim in *Ferguson* was to prosecute drug-abusing mothers. Again, as in *Edmond,* the City of Charleston's immediate purpose in executing the warrantless drug tests was to arrest and prosecute those subjected to the search, *i.e.,* generally to gather evidence of a crime being committed. Given that immediate law enforcement purpose, the Supreme Court held that the search did not fit any special need of law enforcement personnel. *Ferguson,* 532 U.S. at 82–83, 121 S.Ct. at 1291, 149 L.Ed.2d 205. The Court also noted that the mothers subject to the drug testing policy were not probationers or incarcerates with diminished expectations of privacy, but normal citizens. *Ferguson,* 532 U.S. at 79 n. 15, 121 S.Ct. at 1289 n. 15, 149 L.Ed.2d 205 (stating, in distinguishing the case from *Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), "that *Griffin* is properly read as limited by the fact that probationers have a lesser expectation of privacy than the public at large").

In the case *sub judice,* not only is the primary purpose of the Act to identify individuals involved in crime (including the vindication of those falsely convicted), or accidents [13] but the

---

**13.** For example, if a person was involved in an automobile accident where the person and all of his or her identifying documents were burned beyond recognition, and that person was an ex-convict who was

limited intrusion applies, not to members of the general public, like the Indianapolis checkpoints described in *Edmond* and the Charleston drug tests described in *Ferguson*, but only to a certain class of convicted criminals. As the prior cases illustrate, incarcerated persons have a severely diminished expectation of privacy. Unlike the unregulated access to DNA profile concerns of appellee, the only information obtained from the DNA linked to the individual pursuant to the Act is the DNA identity of the person being tested.[14] The DNA profile thus serves the purpose of increasing the efficiency and accuracy in identifying individuals within a certain class of convicted criminals. The purpose is akin to that of a fingerprint. As such, appellee and other incarcerated individuals have little, if any, expectation of privacy in their identity. Therefore, a search like the one authorized by the Act in this case, whose primary purpose is to identify individuals with lessened expectations of privacy, is totally distinguishable from search of ordinary individuals for the purpose of gathering evidence against them in order to prosecute them for the very crimes that the search reveals.

## C. The *Ex Post Facto* Clauses

█ Appellee,[15] in his cross-petition, raises the question of whether the suppression court erred in not finding that the Act violates the *Ex Post Facto* Clauses contained within the United States Constitution and the Maryland Declaration of Rights. Appellee argues that the collection of DNA samples from all persons convicted of a qualifying crime, when the qualifying crime was committed prior to the effective date of the Act, violates the relevant *ex post facto* clauses because the

---

subject to the Act, then the DNA profile might be used to identify the accident victim.

14. The Act also has several provisions, discussed *infra*, specifically designed to protect individuals subject to the Act from the unauthorized use of their DNA profile.

15. As appellee is raising this question in a cross-petition, he is technically labeled the "cross-appellant." To be consistent and to avoid confusion, however, we shall refer to Mr. Raines only as "appellee."

primary purpose of the Maryland DNA Collection Act is punitive in nature, making the statute retributive. The State, however, contends that the Act is civil in nature, a statute that, in and of itself, imposes no punishment upon the persons subject to DNA collection.

Article I, § 10, clause 1 of the United States Constitution prohibits the States from passing any *ex post facto* law, stating, "No State shall ... pass any ... *ex post facto* Law." [16] The Maryland Declaration of Rights, Article 17, provides similar protections, as it states "[t]hat retrospective Laws, punishing acts committed before the existence of such Laws, and by them only declared criminal, are oppressive, unjust and incompatible with liberty; wherefore, no *ex post facto* Law ought to be made; nor any retrospective oath or restriction be imposed, or required." This Court has held that "Maryland's *ex post facto* clause has been viewed generally to have the 'same meaning' as its federal counterpart." *Watkins v. Dep't of Pub. Safety and Correctional Services,* 377 Md. 34, 48, 831 A.2d 1079, 1087 (2003) (quoting *Gluckstern v. Sutton,* 319 Md. 634, 665, 574 A.2d 898, 913 (1990) (quoting *Anderson v. Dep't of Health & Mental Hyg.,* 310 Md. 217, 223, 528 A.2d 904, 907 (1987))).

An *ex post facto* law is defined as "[a] law that applies retroactively, [especially] in a way that negatively affects a person's rights, as by criminalizing an action that was legal when it was committed." *Black's Law Dictionary* 601 (Bryan A. Garner ed., 7th ed., West 1999) (alterations added). This Court has said that "two critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Frost v. State,* 336 Md. 125, 136, 647 A.2d 106, 112 (1994) (quoting *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981) (footnote omitted)).

---

**16.** The United States Constitution additionally prohibits Congress from passing *ex post facto* laws. U.S. Constitution, Art. I, § 9, cl. 3.

In *Stogner v. California,* 539 U.S. 607, 611, 123 S.Ct. 2446, 2449–50, 156 L.Ed.2d 544 (2003) (quoting *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 391, 1 L.Ed. 648 (1798)), the Supreme Court recently reiterated the type of "manifestly *unjust and oppressive* " harms that the *Ex Post Facto* Clause was intended to avoid. The *Stogner* Court quoted the following words of Justice Chase from *Calder v. Bull, supra:*

> " 'I will state what laws I consider *ex post facto* laws, within the words and the intent of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender. All these, and similar laws, are manifestly unjust and oppressive.' "

*Stogner,* 539 U.S. at 612, 123 S.Ct. at 2450, 156 L.Ed.2d 544 (quoting *Calder,* 3 U.S. (3 Dall.) at 390–91, 1 L.Ed. 648) (emphasis omitted).

The State emphasizes the issue as to whether the Act in the case *sub judice* is punitive in nature as "whether the [Act], which broadened qualifying offenses from sex offenses to all violent crimes, falls within the third category of prohibited laws" listed in the above excerpt from *Stogner, i.e.,* whether the Act "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Stogner,* 539 U.S. at 612, 123 S.Ct. at 2450, 156 L.Ed.2d 544 (quoting *Calder,* 3 U.S. (3 Dall.) at 390–91, 1 L.Ed. 648). An essential component of our analysis, therefore, is a determination of whether the Act in question is penal/punitive in character, or whether it was intended to be merely civil in nature. Although the issue of whether DNA collection statutes are criminal or civil in nature has not been decided by either the Supreme Court or this Court, we find guidance in the Su-

preme Court's decision in *Smith v. Doe,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), and its *ex post facto* analysis of a sex offender registration statute.

The Supreme Court, in *Smith v. Doe, supra,* set out the following framework for its analysis of whether the Alaska Sex Offender Registration Act was civil or punitive:

"We must 'ascertain whether the legislature meant the statute to establish "civil" proceedings.' *Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is ' "so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil." ' *Ibid.* (quoting *United States v. Ward,* 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). Because we 'ordinarily defer to the legislature's stated intent,' *Hendricks, supra,* at 361, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501, ' "only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty,' *Hudson v. United States,* 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (quoting *Ward, supra,* at 249, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742); *see also Hendricks, supra,* at 361, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501; *United States v. Ursery,* 518 U.S. 267, 290, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996); *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 365, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984)."

*Smith,* 538 U.S. at 92, 123 S.Ct. at 1146–47, 155 L.Ed.2d 164. That Court went on to state that the question of whether legislature meant for the statute to be criminal or civil in nature was a matter of statutory construction and that it first would consider the statute's text and structure in determining that legislative objective. *Id.; see also Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 2081–82, 138 L.Ed.2d 501 (1997).

The *Smith* Court next asked whether the legislature "indicated either expressly or impliedly a preference for one label or the other." *Smith*, 538 U.S. at 93, 123 S.Ct. at 1147, 155 L.Ed.2d 164 (quoting *Hudson v. United States*, 522 U.S. 93, 99, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997) (internal citations omitted)). The stated purpose in the Alaska statute was aimed to protect the public against the high rate of recidivism of sexual predators. The Supreme Court rebuffed the defense claim that, because the protection of the public welfare is similar to one of the purposes of criminal laws, the legislature intended the statute to be criminal in nature, by stating:

"As the Court stated in *Flemming v. Nestor*, rejecting an *ex post facto* challenge to a law terminating benefits to deported aliens, where a legislative restriction 'is an incident of the State's power to protect the health and safety of its citizens,' it will be considered 'as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment.' 363 U.S., at 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (citing *Hawker v. New York*, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898)). The Court repeated this principle in *89 Firearms*, upholding a statute requiring forfeiture of unlicensed firearms against a double jeopardy challenge. The Court observed that, in enacting the provision, Congress ' "was concerned with the widespread traffic in firearms and with their general availability to those whose possession thereof was contrary to the public interest." ' 465 U.S., at 364, 104 S.Ct. 1099, 79 L.Ed.2d 361 (quoting *Huddleston v. United States*, 415 U.S. 814, 824, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974)). This goal was 'plainly more remedial than punitive.' 465 U.S., at 364, 104 S.Ct. 1099, 79 L.Ed.2d 361. *These precedents instruct us that even if the objective of the Act is consistent with the purposes of the Alaska criminal justice system, the State's pursuit of it in a regulatory scheme does not make the objective punitive.*"

*Smith*, 538 U.S. at 93–94, 123 S.Ct. at 1147–48, 155 L.Ed.2d 164 (emphasis added).

In this case, the Maryland Legislature specifically enumerated several purposes for the Act, which we have heretofore

described, none of which was to further punish criminals for crimes already committed at the time of the enactment of the law. Appellee argues "that the primary purpose of the extraction, analysis and permanent retention of an inmate's DNA under the Maryland DNA collection statute is to promote the traditional aims of criminal punishment." Because one of the statute's purposes is for the investigation of future or past crimes, appellee contends that the deterrent effect of such a statute brings it within the purview of the *ex post facto* clauses.

The Supreme Court, in *Smith,* specifically rejected that far-reaching assertion, holding that the purpose of the law being consistent with traditionally criminal aims was not dispositive of the issue. That Court stated that "even if the objective of the Act is consistent with the purposes of the ... criminal justice system, the State's pursuit of it in a regulatory scheme does not make the objective punitive." *Smith,* 538 U.S. at 94, 123 S.Ct. at 1148, 155 L.Ed.2d 164; *see also Hudson, supra,* 522 U.S. at 105, 118 S.Ct. at 496, 139 L.Ed.2d 450 (stating, in a double jeopardy context, that "[t]o hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' ... would severely undermine the Government's ability to engage in effective regulation"). In the case *sub judice,* the Act functions as a regulatory scheme designed to protect public safety by providing a means to identify persons. This purpose is furthered whether the persons to be identified are assailants or victims, or are involved in crimes or accidents, because the Act also was created to assist in the identification of human remains and the identification of missing individuals as well as to aid in criminal investigations. Basically, no prior action of a convicted felon is criminalized or punished by the test of the Act. The Act primarily serves as a regulatory scheme aiding in the identification of individuals. Any deterrent effect is secondary to the regulatory nature of the statute.

The facts of appellee's case do not support his deterrence argument that such a traditional aim of the criminal justice system serves to make the Act penal or punitive in nature. In

appellee's case, the DNA match could not have acted to deter him from committing the crime with which he is now charged, because the rape occurred years prior to the taking of his DNA. The DNA match to the independent DNA evidence of the victim's rape provided only probable cause for another DNA test; it did not stand alone as the only evidence to convict appellee. *See* § 2–510. The semen he had allegedly deposited in the victim was placed voluntarily there by him against the victim's wishes. It was not collected pursuant to the Act. The sample taken pursuant to the Act, thus, provides no deterrent effect for past crime, nor any direct evidence at trial on a new charge. Evidence independent of the crime for which the individual is being incarcerated must exist, along with a second DNA match, before any possibility of punishment arises. And then the punishment is for a prior crime— and it is not increased.

Additionally, any rehabilitated convict would suffer no ill effect from the statute, and any effect from the Act is even less restrictive than the public ridicule, shaming and affirmative obligations of the sex offender registration laws not held to be criminal in nature in *Smith*. In the case at bar, the investigatory nature of the Act requires independent DNA evidence of a crime in order for the person to be subject to a match. There is no affirmative obligation imposed on, or restraint on freedom to the convict after the buccal swab is taken. Simply put, no punishment actually is levied by the Act.

The Act's placement in the Public Safety Article, as opposed to the Criminal Article of the Maryland Code, supports that the Act's purpose is primarily civil in nature. The Supreme Court has recognized aspects of statutory construction and placement within the code as factors in determination the legislative intent on the characterization of a law as criminal or civil. In *Smith*, the Court stated that "formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes, are probative of the legislature's intent." *Smith*, 538 U.S. at 94, 123 S.Ct. at 1148, 155 L.Ed.2d 164. The provisions of sex offender regis-

tration in *Smith* were contained, not only in Alaska's Health, Safety, and Housing Code, but additionally in the state's criminal procedure code. The Court nonetheless held that "[t]he partial codification of the Act in the State's criminal procedure code is not sufficient to support a conclusion that the legislative intent was punitive." *Id.* at 95, 123 S.Ct. at 1148, 155 L.Ed.2d 164.

In the case *sub judice*, the fact that there is no partial codification within the Criminal Article of the Code—the Act is located solely within the Public Safety Article—suggests that the Act creates a regulatory scheme and is thus civil in character. For example, as previously mentioned, § 2–502 of the Act creates a regulatory statewide DNA data base system, which is headed by a Director. Pursuant to § 2–503, the Director and Secretary of the DNA data base system are to consult with each other to adopt appropriate regulations for the administration of the system. Additionally, none of the § 2–505 purposes directly calls for any criminal sanctions to be imposed for prior *convictions*. Section 2–511, which contains the Act's only specific reference to the Criminal Procedure Article of the Maryland Code (besides the qualifying crimes in § 2–501(g)(1) and § 2–504), merely allows for the removal of an individual's DNA information and sample from the system where the individual fits the expungement criterion of the Code. Finally, the last section in the Act, § 2–512, is the only section which prescribes any penalty whatsoever. The penalties, however, do not punish the person whose DNA was collected pursuant to the Act, but any person who illegally discloses or obtains DNA information from the data bank. Thus the only penalties actually created by the Act serve not to punish the persons subject to the Act's DNA collection provisions because of their prior convictions, but specifically to protect the rights of those same individuals. A review of the Act, therefore, reveals that it imposes no affirmative obligation, impediment or punishment on those convicted criminals subject to its provisions. The Act is civil, not criminal, in nature.

Although we have determined that the Act is civil in character on its face, we now look to an analysis of the actual effects of the Act. In answering this question, the Supreme Court has set out several factors for consideration in the case of *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963), which have been incorporated into Supreme Court *ex post facto* case law from the area of double jeopardy jurisprudence. The Supreme Court, in *Mendoza–Martinez*, stated:

> "The punitive nature of the sanction here is evident under the tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character, even though in other cases this problem has been extremely difficult and elusive of solution. Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions. Absent conclusive evidence of congressional intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face."

*Id.* (footnotes omitted). The Supreme Court has said that the *Mendoza–Martinez* factors are "neither exhaustive or dispositive" in every context, *Smith*, 538 U.S. at 97, 123 S.Ct. at 1149, 155 L.Ed.2d 164 (quoting *United States v. Ward*, 448 U.S. 242, 249, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980)), but serve as "useful guideposts," *Smith*, 538 U.S. at 97, 123 S.Ct. at 1149, 155 L.Ed.2d 164 (quoting *Hudson, supra*, 522 U.S. at 99, 118 S.Ct. at 493, 139 L.Ed.2d 450), in analysis by a court. In the *ex post facto* context most analogous to the case *sub judice*, the *Smith* Court said:

"The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose."

*Smith*, 538 U.S. at 97, 123 S.Ct. at 1149, 155 L.Ed.2d 164.

In analyzing the effects of the Alaska Sex Offender Registration Act under these *Mendoza–Martinez* factors, the Supreme Court held that the effect of the statute did not violate the *Ex Post Facto* Clause of the United States Constitution. The *Smith* Court began its discussion of the *Mendoza–Martinez* factors with an analysis of whether statutory requirements for sex offenders to register fell within historical punishments. In holding that public sex offender registration, including internet posting of registration information, was not akin to traditional punishments such as shaming, branding and the like, the Supreme Court held that:

"The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation."

*Smith*, 538 U.S. at 99, 123 S.Ct. at 1150, 155 L.Ed.2d 164. The Court went on to describe that, while the effect of internet posting made registration information more readily available and subjected the offender to shame and humiliation, it merely made the regulatory process more efficient and effective—not punitive.

The DNA profiles obtained pursuant to the Act certainly make the identification of suspects, victims, "John Does" and the like, more efficient and reliable than traditional methods such as fingerprinting, but, similar to the internet posting of sex offender registrations, do not make the statute punitive. Additionally, a convicted criminal subject to this Act will not be subjected to further penalties or punishments merely because of his or her compliance with the terms of the Act. In

order for the convicted criminal to face such punishment indirectly resulting from compliance with the Act, he or she must have committed, at some point in the past, or must commit at some point in the future, an independent criminal act for which independent punishment might be imposed upon conviction. Any punishment stemming from this independent act would only occur after conviction for the commission of that separate crime. The police would need to recover independent DNA evidence of the future (or past) crime before the DNA profile could be used and the DNA taken pursuant to the Act would merely be for identification in light of the new (or old) DNA evidence normally recovered from a victim. Not only is separate evidence of a separate crime required before any prosecution could take place based upon the convicted criminal's DNA swab, but a positive initial DNA match is not generally admissible at trial—the match results only in probable cause for a second swab and test. These facts clearly illustrate that the Act itself does not contemplate additional, traditional punishments for past crimes. It only seeks, using recent, accurate technology, to search a pool of probable recidivists to identify persons, either victims or perpetrators, of separate crimes, victims of accidents or missing persons.

The next *Mendoza–Martinez* factor discussed by the *Smith* Court was that of imposing "an affirmative disability or restraint." Here, as previously mentioned, no such disability or restraint exists. Unlike the sex offender statutes, which, although found not to impose a restraint, imposed affirmative obligations on sex offenders to register and submit frequent updates to authorities, the DNA Collection Act imposes no duty whatsoever on the convicted criminal. The only action required of the criminal by the Act is submitting to a single buccal swab of the individual to obtain that specific individual's DNA. Nothing is required after this initial taking of a DNA sample. There is no need for the convict to return with updates, and he or she is not forced to divulge his personal information to the public.[17] In fact, a wrongly convicted

---

17. Although Appellee and the amici speak of doomsday type scenarios where every person's, including non-convicts', DNA would be subject to

criminal, after his or her conviction is reversed or vacated, may expunge his or her DNA profile and samples from the data base, thus entirely ceasing his or her connection with the DNA data base. Thus, it is clear that the Act imposes little restraint on the persons subject to it, as, after they serve their sentences, they are free to live their lives, within the confines of the law, as they wish.

Without citing to any cases, appellee argues that a determination in regard to this factor does not necessarily "focus on the *manner* of the collection of the DNA sample, but rather on the *extent* and *scope* of information so collected." The Supreme Court, in *Smith,* focused on physical restraints, employability and mobility of the sex offenders in spite of the public availability of the information posted. *Smith,* 538 U.S. at 99–101, 123 S.Ct. at 1151–52, 155 L.Ed.2d 164. Here, even if the

search by both police and unauthorized persons and soon would be subject to nearly unregulated access, the current version of the Maryland DNA Collection Act does not even approach such unregulated access to DNA profiles. The Legislature has inserted several provisions within the Act for the purpose of safeguarding against this very type of unregulated access to personal information.

First, pursuant to § 2–509, all personal identifiers are to be removed *before* any DNA profile is put into the population data base. Similarly, § 2–506(b) of the Act limits the use of the DNA information to the stated purposes (of which, DNA for research purposes may only be used after personal identifiers are removed). Additionally, unlike a rehabilitated sex offender who cannot remove his information from the registry, a wrongly convicted person whose crime fits the expungement criterion of the § 10–105 or § 10–106 of the Criminal Procedure Article can request to have his or her DNA profile and sample expunged from the system. § 2–511. But, most importantly, the Legislature included severe penalties for the improper disclosure, and unauthorized obtaining, of DNA profile information in § 2–512.

In sum, the statute specifically is limited to convicted criminals (including persons convicted of felonies and certain misdemeanor burglaries) with a high rate of recidivism and contains several protections—it does not provide a means for non-law enforcement persons generally to obtain and misuse personal information of all convicts or any other persons. The Act does not promote or even contemplate allowing unfettered access to DNA profiles of all criminals and/or other individuals. It is limited to a specific group of criminals likely to be repeat offenders. Because of the specific protections outlined in the Act, there is little, if any, danger of the "slippery slope" as appellee argues.

extent and scope of the information collection were to be considered, it would not alter our decision. The public does not see any of the private information which appellee argues takes this case into the realm of a punitive nature. The Act provides several protections against the unauthorized dissemination of such information. Additionally, the extent and scope of the information collected imposes no restraint or disability on the convicted criminal. Once released from prison or upon completing probation, the individuals are free to go about their everyday lives. They are not required to submit to periodic tests, updates or meetings. They can move out of the state. They are not subject to ridicule or shaming for their past crimes. They may apply for jobs. The list goes on—after the minor physical intrusion of the buccal swab (which lasts only for a few seconds), these individuals are subjected to no more restraint than every other convict or ex-convict.

The third *Mendoza–Martinez* factor discussed in *Smith* was whether the statute promotes the "traditional aims of punishment—retribution and deterrence." *Mendoza–Martinez,* 372 U.S. at 168–69, 83 S.Ct. at 567–68, 9 L.Ed.2d 644. As previously discussed, the *Smith* Court specifically rejected the argument that "the mere presence of a deterrent purpose renders such sanctions 'criminal.'" *Smith,* 538 U.S. at 102, 123 S.Ct. at 1152, 155 L.Ed.2d 164; *see also Hudson, supra,* 522 U.S. at 105, 118 S.Ct. at 496, 139 L.Ed.2d 450. In fact, the Court said that where the reporting requirement under the sex offender registration statute was related to the "danger of recidivism," it was "consistent with the regulatory objective." *Smith,* 538 U.S. at 102, 123 S.Ct. at 1152, 155 L.Ed.2d 164. Here, the obtaining of a specified group of convicts' DNA is reasonably related to combating the danger of recidivism and is consistent with the regulatory objectives of solving crimes, identifying victims and finding missing persons.

The Supreme Court has stated that a statute's "rational connection to a nonpunitive purpose is a '[m]ost significant' factor in [its] determination that the statute's effects are not punitive." *Smith,* 538 U.S. at 102, 123 S.Ct. at 1152, 155

L.Ed.2d 164 (quoting *United States v. Ursery,* 518 U.S. 267, 290, 116 S.Ct. 2135, 2148, 135 L.Ed.2d 549 (1996)). In the case *sub judice,* the Act is reasonably related to its public safety purposes in identifying suspects, and human remains. The Act functions to create a more efficient method of identification and increases the chances that guilty persons will be apprehended and innocent persons absolved of criminal responsibility. In fact, it not only has been used to solve crimes and identify suspects, but also to vindicate those wrongly convicted. By making the identification process more efficient and accurate, the Act is rationally related to its purposes.

Appellee argues that even if the Act is rationally related to the nonpunitive purposes of the Act, it is excessive in respect to those purposes, because the DNA profiles and samples "reveal far more than an individual's identity." We disagree. First, the law only applies to persons convicted of felonies (and a small, narrow class of misdemeanor burglaries). The *Smith* Court said:

"The *Ex Post Facto* Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences. We have upheld against *ex post facto* challenges laws imposing regulatory burdens on individuals convicted of crimes without any corresponding risk assessment. *See De Veau[ v. Braisted],* 363 U.S., [144] at 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109; *Hawker,* 170 U.S., at 197, 18 S.Ct. 573, 42 L.Ed. 1002. As stated in *Hawker:* 'Doubtless, one who has violated the criminal law may thereafter reform and become in fact possessed of a good moral character. But the legislature has power in cases of this kind to make a rule of universal application....' *Ibid.* The State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the *Ex Post Facto* Clause."

*Smith,* 538 U.S. at 103–04, 123 S.Ct. at 1153, 155 L.Ed.2d 164. In the case at bar, the permanent retention of the DNA samples, contrary to appellee's assertions, is not excessive in

light of the profiles already being stored in the data bank. In fact, if a profile is accidentally erased or destroyed, retaining the sample prevents future intrusions or restraints on the individual, because another buccal swab would not need to be collected. The Act ensures a one-time minimal intrusion and is even less intrusive than the continuing sets of requirements, reports and updates, that was upheld by the Supreme Court in *Smith*. The Act's scope is furthered minimized by the fact that the Act places several protections on the storage and dissemination of the DNA information and samples, even criminalizing the improper disclosure and obtaining of DNA profile information. The Act is clearly not excessive in light of these protections coupled with the substantial public good it serves in identifying those involved with criminal acts.

Similar to the Supreme Court's decision in *Smith*, there is no need for this Court to discuss the final two *Mendoza–Martinez* factors: whether the Act only functions upon a finding of scienter and whether the behavior the Act applies to is already a crime, as they have little relevance here. Here, the Act, like the sex offender registration laws in *Smith*, primarily focuses on past criminal conduct, *i.e.*, those convicted of the qualifying crimes, which, as in *Smith*, "is a necessary beginning point, for recidivism is the statutory concern." *Smith*, 538 U.S. at 105, 123 S.Ct. at 1154, 155 L.Ed.2d 164. As such, no scienter or *mens rea* is needed to trigger the effect of the Act.

The United States Court of Appeals for the Fourth Circuit, in *Jones v. Murray, supra*, also has held that the Virginia DNA collection statute, similar to Maryland's in that it calls for the taking of DNA samples, albeit blood samples, from convicts incarcerated prior to the enactment of the statute, was not in violation of the federal *Ex Post Facto* Clause.[18] In

---

18. The Fourth Circuit did hold, however, that the specific provision of the statute that allowed:

"the continued incarceration beyond a time six months prior to the end of the actual sentence of an inmate convicted prior to the enactment of § 19.2–310.2, for any reason not reflected in the terms

holding that the *Ex Post Facto* Clause was not violated by the Virginia statute, the Fourth Circuit stated:

"Emerging clearly from this discussion is the conclusion that a statute that is not penal cannot be *ex post facto.* Thus it cannot be said that the DNA testing, itself, runs afoul of the *Ex Post Facto* Clause. We agree with the district court's finding that:

'The requirement that prisoners provide blood samples is not punitive in nature. . . . The blood sample is taken and analyzed for the sole purpose of establishing a data bank which will aid future law enforcement.'

In light of our determination that the program withstands challenge under the Fourth Amendment, the blood testing requirement legally can be implemented, and as is the case regarding any valid prison regulation, violators can be administratively punished for their failure to provide samples.

"The *Ex Post Facto* Clause does not prevent prison administrators from adopting and enforcing reasonable regulations that are consistent with good prison administration, safety and efficiency. As we stated in *Gaston v. Taylor,* 946 F.2d 340, 343 (4th Cir.1991) (en banc),

'[C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and denials of privileges— matters which every prisoner can anticipate are contemplated by his original sentence to prison—are necessarily functions of prison management that must be left to the broad discretion of prison administrators.'

It is precisely because reasonable prison regulations, and subsequent punishment for infractions thereof, are contemplated as part of the sentence of every prisoner, that they do not constitute additional punishment and are not classi-

---

of the mandatory parole provision, would constitute a retroactive extension of the inmate's sentence which is prohibited by the *Ex Post Facto* Clause."

*Jones,* 962 F.2d at 310. That situation, however, is not presented by the Act or by the case *sub judice.*

fied as *ex post facto.* Moreover, since a prisoner's original sentence does not embrace a right to one set of regulations over another, reasonable amendments, too, fall within the anticipated sentence of every inmate. We therefore conclude that neither Virginia's blood testing requirement, itself, nor the infliction of punishment within the terms of the prisoners' original sentence for a violation of the requirement, is *ex post facto.*"

*Jones,* 962 F.2d at 309–10.

The provisions of the Act here at issue do not make a prior non-criminal act criminal. They do not make a prior criminal act a more serious crime. They do not change the punishment for any crime. They do not alter the rules of evidence or require less evidence in order to support a conviction, than the level of evidence required before the Act. The taking of DNA data does not increase the punishment for any crime. It merely provides information. If no crimes exists to which the data is matched, nothing happens. By itself, the DNA data is data and nothing more. Given the analogous Supreme Court case of *Smith,* the Fourth Circuit's specific holding in regard to the portion of the Virginia statute resembling Maryland's DNA collection statute and our analysis of the specific text, structure and effect of the Maryland DNA Collection Act, it is clear that the Act was intended not to elicit a punishment for acts already committed, but to create a sensible regulative scheme in order to protect the public by identifying individuals involved with crimes.

### III. Conclusion

We hold that the Circuit Court for Montgomery County erred in holding that the Maryland DNA Collection Act was unconstitutional. The Act's provisions allowing the State to obtain the DNA profile of a certain group of convicted persons to store in a DNA data base is reasonable, because the minimal physical intrusion on the inmate, a person with a diminished expectation of privacy, is outweighed by the legitimate governmental interest in identifying persons involved with crimes, including vindicating those falsely convicted. The

suppression court was correct, however, in finding that the Act did not violate the *Ex Post Facto* Clauses of the United States Constitution and the Maryland Declaration of Rights. The motion should have been denied.[19] The suppression court's granting of the motion to suppress is reversed.

---

**19.** We note that an analysis of whether an intrusion is minimal focuses on the pervasiveness of the physical intrusion itself and the place being searched. The balance of reasonableness does not involve what is found by the search, *i.e.*, the amount and content of the information seized.

The error in logic if we were to focus on what was found instead of the physical intrusion can be seen in the following examples. If the government forced an operation to recover bone marrow from an inmate, which would be a much more serious physical intrusion than a buccal swab, and no relevant information was found from that operation, by Judge Wilner's logic, only a minimal intrusion would have occurred. If a rectal examination of a prisoner were to be conducted, and if nothing were found the intrusion would be less than the intrusion would be if contraband were found, but unquestionably the digital penetration would be the same. Such results are illogical.

In the case *sub judice*, the intrusion that we must assess under the Fourth Amendment balancing test is obtaining DNA from individuals under the Act, *i.e.*, a buccal swab. Several courts have held that this type of search (or, in the case of blood tests and the like, more invasive searches) is minimal when the person being searched is incarcerated. *See Jones*, 962 F.2d at 307 (holding that, while more invasive than fingerprinting, that a blood test to obtain DNA was still a minor intrusion), *cert. denied*, 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992); *Rise*, 59 F.3d at 1560 (upholding the Oregon DNA collection law prior to, as previously mentioned, the Ninth Circuit's *Kincade* opinion, which, although it impliedly overruled *Rise*, subsequently was vacated by the Ninth Circuit, that, as stated previously, has yet to render a decision on rehearing en banc, and stating "[t]hat the gathering of DNA information requires the drawing of blood rather than inking and rolling a person's fingertips does not elevate the intrusion upon the plaintiffs' Fourth Amendment interests to a level beyond minimal"), *cert. denied*, 517 U.S. 1160, 116 S.Ct. 1554, 134 L.Ed.2d 656 (1996); *Boling v. Romer*, 101 F.3d 1336, 1340 (10th Cir.1997) (upholding DNA statute, in part, because of "the minimal intrusion of saliva and blood tests"); *Bousman v. Iowa Dist. Court for Clinton County*, 630 N.W.2d 789, 798 (Iowa 2001) (stating that the Iowa court does "not think saliva sampling involves a significant intrusion into a person's bodily security"); *Landry*, 709 N.E.2d at 1094 (Massachusetts Supreme Court stating that their DNA statute involves "persons who have a low expectation of privacy in their identity, and a new, and validated, technology which can, by means of a properly performed *minimally invasive* test, obtain and preserve an extremely accurate record of identification") (emphasis added); *Johnson v. Commonwealth*, 529

RAKER, Judge, concurring:

I join in the judgment of the Court reversing the judgment of the Circuit Court for Montgomery County which held that the Maryland DNA Collection Act is unconstitutional. I write separately because, in my view, the statute is constitutional on the narrow grounds that DNA sampling is an acceptable means of identifying prisoners, and on this basis alone, is reasonable.[1]

---

S.E.2d at 779 (Virginia Supreme Court agreeing with the *Jones'* Court's holding that the blood test to obtain DNA was a minimal intrusion), *cert. denied*, 531 U.S. 981, 121 S.Ct. 432, 148 L.Ed.2d 439 (2000); *In re Nontestimonial Identification Order Directed to R.H.*, 171 Vt. 227, 762 A.2d 1239, 1247 (2000) (concluding that "saliva sampling involves no intrusion into a person's life or thoughts" and that the court did "not believe a saliva procedure involves a 'serious intrusion upon personal security' ") (citation omitted); *Doles v. State*, 994 P.2d 315, 318–19 (Wyo.1999); *cf. Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 625, 109 S.Ct. 1402, 1417, 103 L.Ed.2d 639 (1989) (intrusions such as blood and urine tests are "not significant"); *Schmerber v. California*, 384 U.S. 757, 771, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966) (stating that extraction of blood samples "are a commonplace in these days of periodic physical examination and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain") (footnote omitted); *Winston v. Lee*, 470 U.S. 753, 762, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662 (1985) (recognizing that *Schmerber* stated that "society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity").

The amount of information seized pursuant to that buccal swab does not make, and logically cannot make, that initial minimal intrusion of obtaining it, more intrusive.

1. The State argues that the Maryland DNA Collection Act is constitutional based on the "special needs" doctrine, as the collection of DNA from convicted offenders serves a special need of the government. Some courts have held prisoner DNA databases to be acceptable on that basis. *See e.g., Green v. Berge*, 354 F.3d 675, 679 (7th Cir.2004); *United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir.2003). I do not believe that "special needs" justifies suspicionless collection of DNA from prison inmates.

I agree with Judge Wilner, that the purpose of the DNA collection act is to further normal law enforcement needs. *See* Wilner, J., concurring. Therefore, the "special needs" doctrine cannot support the constitutionality of the Maryland DNA Collection Act under the Fourth Amendment.

Justice Blackmun introduced the term "special needs" in the context of Fourth Amendment law. *See New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S.Ct. 733, 747, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring).

**44**

I cannot agree with the majority that prisoners, or for that matter, all convicted felons, merely because they are incarcerated, lose the expectation of privacy for bodily fluids. Prisoners do not forfeit their general right to remain free from bodily invasions, even though they do have a greatly reduced expectation of privacy. That reduced expectation of privacy is limited generally to security concerns and prison administration, *see Jones v. Murray*, 962 F.2d 302, 311–12 (4th Cir.1992) (Murnaghan, J., concurring in part and dissenting in part), and bodily searches of inmates are to be considered in light of the balance between these interests and individual privacy rights. *See Bell v. Wolfish*, 441 U.S. 520, 560, 99 S.Ct. 1861, 1885, 60

---

As explained in *Ferguson v. Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001):
> "Justice Blackmun agreed with the Court that there are limited exceptions to the probable-cause requirement, in which reasonableness is determined by 'a careful balancing of governmental and private interests,' but concluded that such a test should only be applied 'in those exceptional circumstances in which *special needs, beyond the normal need for law enforcement*, make the warrant and probable-cause requirement impracticable ...' "

*Id.* at 74 n. 7, 121 S.Ct. at 1286 n. 7, 149 L.Ed.2d 205 (emphasis added) (citations omitted). While accepting this interpretation of search and seizure law, the Supreme Court has prohibited "special needs" analysis in the context of ordinary law enforcement activities. *See id.* at 84, 121 S.Ct. at 1291–92, 149 L.Ed.2d 205.

I agree with the special needs analysis set out by Justice Robert Utter, in *State v. Olivas*, 122 Wash.2d 73, 856 P.2d 1076 (1993) (concurring):
> "[T]he 'special needs' analysis ... was not designed for application to searches and seizures in the context of ordinary law enforcement. Instead, the non-consensual DNA testing scheme should be analyzed and upheld under traditional doctrines of criminal Fourth Amendment law."

*Id.* Noting that the rationale of the "special needs" doctrine has not been fully elaborated by the Supreme Court, Justice Utter opined that it is unclear whether courts are to balance the government's need to conduct a search against an individual's privacy interest, or to balance the government's need to conduct the search *without a warrant* against an individual's privacy interest. *See id* at 1090. If "special needs" justifies a search under the former, the Fourth Amendment and the warrant requirement will be swallowed by the exception to the rule. *See id.* at 1092 (noting that if "special needs" analysis were to be extended to the arena of criminal law enforcement, the warrant requirement of the Fourth Amendment could ultimately be rendered illusory).

L.Ed.2d 447 (1979). Therefore, practical matters, generally related to the control of dangerous inmates, determine the acceptability of Fourth Amendment limitations. *See Hudson v. Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984). These considerations attest to some privacy right among prisoners, even if that right may be limited to goals related to prison administration and security. As such, absent more specific justification, invasion of an inmate's body cannot be supported by a lessened expectation of privacy alone.

I find the State's analogy to the collection of fingerprints convincing and would uphold the statute on that basis alone. Although the DNA sample differs from a fingerprint in that far more personal information could be discovered and revealed,

"DNA type need be no more informative than an ordinary fingerprint. For example, the thirteen core STR loci used in current criminal offender databases are noncoding, nonregulatory loci that are not linked to any genes in a way that would permit one to discern any socially stigmatizing conditions. The 'profile' of an individual's DNA molecule that is stored in a properly constructed DNA identification database (like the FBI's Combined DNA Index System (CODIS)) is a series of numbers. The numbers have no meaning except as a representation of molecular sequences at DNA loci that are not indicative of an individual's personal traits or propensities. In this sense, the CODIS 13–STR 'profile' is very much like a social security number—though it is longer and is assigned by chance, not by the federal government. In itself, the series of numbers can tell nothing about a person. But because the sequence of numbers is so likely to be unique (with the exception of identical twins), it can be linked to identifiers such as name, date of birth, or social security number, and used to determine the source of DNA found in the course of criminal investigations or to identify human remains or persons who are lost or missing."

D. Kaye & M. Smith, *DNA Identification Databases: Legality, Legitimacy, and the Case for Population–Wide Coverage,* 2003 Wis. L. Rev. 413, 431–32 (2003) (footnotes omitted).

Under the Maryland DNA Collection Act, the use of the information acquired by the State is limited. Section 2–505 of the Public Safety Article states, in relevant part:

"(b) *Limitations on DNA records.*—(1) Only DNA records that directly relate to the identification of individuals shall be collected and stored.

(2) DNA records may not be used for any purposes other than those specified in this subtitle."

Section 2–512 of the Public Safety Article states, in relevant part:

(a) *Disclosure of DNA information to unauthorized persons prohibited*—A person who, by virtue of employment or official position, has possession of or access to individually identifiable DNA information contained in the statewide DNA data base system or statewide DNA repository may not willfully disclose the information in any manner to a person or agency not entitled to receive the information.

(b) *Obtaining DNA information without authorization prohibited*—A person may not, without authorization, willfully obtain individually identifiable DNA information from the statewide DNA data base system or statewide DNA repository.

The fact that more information *may* be gathered with DNA as opposed to fingerprinting should not preclude the State from acquiring the information under the statute.[2]

Reasonableness dictates whether searches are acceptable under the Fourth Amendment, and this is determined by balancing privacy interests of the individual with legitimate governmental interests. *See Wyoming v. Houghton,* 526 U.S.

---

**2.** Additional or subsequent use of the DNA sample by law enforcement is a legitimate concern, and one the Maryland Legislature has addressed in the statute. *See* Section 2–512 of the Public Safety Article. Nonetheless, the possibility of additional use, either lawful or unlawful, does not make an initial lawful seizure unlawful.

295, 299–300, 119 S.Ct. 1297, 1300, 143 L.Ed.2d 408 (1999). The Supreme Court has voiced a general preference for requiring either warrants or individualized suspicion to tip the balance in favor of allowing searches. *See id.* at 309, 119 S.Ct. at 1305, 143 L.Ed.2d 408 (Stevens, J., dissenting). In certain circumstances, the Supreme Court has relaxed or eliminated this preference. *See e.g., United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001); *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, this is acceptable only where the balance of governmental and private interests makes such a standard reasonable. *See Knights,* 534 U.S. at 121, 122 S.Ct. at 592, 151 L.Ed.2d 497. Collection of DNA samples from certain incarcerated persons fits squarely within this acceptable category.

The collection of DNA information for identification purposes, particularly from a cheek swab, constitutes a minimal intrusion upon an individual's Fourth Amendment interests.[3] The technique is only slightly invasive and the data is used exclusively for the purpose of identification. While the collection of DNA samples through buccal swab testing is an invasion of the body subject to Fourth Amendment limitations,[4] the procedure is limited to sampling from the mouth,

---

**3.** While buccal swab testing is minimally invasive, even less intrusive methods of collecting DNA samples have been developed. It is now possible to "extract DNA by applying a sticky patch to the skin on an individual's forearm for a moment to acquire epidermal cells without puncturing the skin surface." B. Quarmby, *The Case for National DNA Identification Cards,* 2003 Duke L. & Tech. Rev. 2, 20 (2003). Using such a technique would further limit the intrusive nature of DNA collection, primarily because there would be no intrusion into the human body.

**4.** The Supreme Court has long recognized that compelled intrusion into the human body constitutes a search as recognized in the Fourth Amendment. *See e.g., Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1412–13, 103 L.Ed.2d 639 (1989); *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662

and is neither long, nor painful. *See* D. Kaye, *The Constitutionality of DNA Sampling on Arrest,* 10 Cornell J.L. & Pub. Pol'y 455, 477–78 (2001). This procedure subjects a prisoner to little more inconvenience than routine fingerprinting, and it is only because the sampling occurs inside the mouth, and not on the surface of the body, that the search method itself creates a greater constitutional question than that seen in fingerprinting.[5]

When a person has been convicted of certain crimes, the State has an interest in the accurate identification of that person. This proposition is supported by an extensive history, as law enforcement has long been involved in "the acquisition, collection, classification and preservation of identification records of those processed through the criminal tribunals." *United States v. Krapf,* 285 F.2d 647, 650 (3rd Cir.1961). Fingerprinting has served as an acceptable means of reaching these goals for many years. *See id.* at 650–51. In one of the first cases dealing with fingerprinting in the prison system, Judge Augustus N. Hand justified that method of identification, stating:

"Any restraint of the person may be burdensome. But some burdens must be borne for the good of the community. The slight interference with the person involved in finger printing seems to us one which must be borne in the common interest.

* * *

"Finger printing seems to be no more than an extension of methods of identification long used in dealing with persons under arrest for real or supposed violations of the criminal

---

(1985); *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966).

5. The Supreme Court has repeatedly noted, "our society's concern for the security of one's person," *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989), and in *Winston v. Lee,* the Court noted that Fourth Amendment analysis, "required a discerning inquiry into the facts and circumstances to determine whether intrusion [into the human body is] justifiable." 470 U.S. 753, 760, 105 S.Ct. 1611, 1616, 84 L.Ed.2d 662 (1985).

laws. It is known to be a very certain means devised by modern science to reach the desired end ..."

*United States v. Kelly,* 55 F.2d 67, 68–69 (2nd Cir.1932) (citations omitted). This same reasoning applies equally to the use of DNA collection today; identifying prisoners through buccal swab testing falls within the category of a "slight interference" necessary for the "common interest."

The collection of DNA is a more precise method of identification than fingerprinting, and thus better serves the State interest in accurately identifying prisoners. No two individuals, excluding identical twins, share the same genetic makeup, and because an individual's DNA is the same in every nucleated cell in the body, and remains so for life, DNA analysis makes it possible to identify a person to the practical exclusion of all others. *See* T. Fleming, Annotation, *Admissibility of DNA Identification Evidence,* 84 A.L.R.4th 313, 319–20 (1991). This level of accuracy has allowed DNA analysis to not only help identify thousands of criminal suspects, but also aid in the exoneration of many wrongfully accused prisoners.

The balance between prisoner privacy rights and governmental interests in identifying prisoners clearly weighs in favor of allowing collection of DNA samples for the purposes of identification. It is clear that the State's interest in identifying prisoners is significant, and as seen in the Maryland DNA Collection Act, the privacy rights violated by buccal swab DNA collection are minimal. Therefore, just as suspicionless fingerprinting of prisoners is reasonable under the Fourth Amendment, suspicionless collection of DNA samples from prisoners is also reasonable.

WILNER, Judge, concurring.

I concur in the judgment. I agree with the majority that the DNA collection law does not constitute an *ex post facto* law and I agree as well that it does not constitute or necessarily result in an *unreasonable* search or seizure, although that issue, to me, is a much closer one.

As the Court points out, the taking of a swab from appellee's cheek constituted a search or seizure within the meaning of the Fourth Amendment and its Maryland counterpart, Art. 26 of the Declaration of Rights. The State concedes as much, and properly so. The ultimate question is whether that search/seizure (or any similar collection of a DNA sample pursuant to the DNA collection law) is Constitutionally reasonable, and that ordinarily involves weighing the right of privacy, to be free from governmental intrusion, against any legitimate need of the Government to conduct the search.

In conducting that weighing process, courts have expressed the belief, and given great weight to it, that the intrusion is minimal and that its purpose is not to gather evidence but merely to establish identity. The majority adopts that view in this case. I have some difficulty with those assertions. It is true that the intrusion involved in actually collecting the sample—swabbing the cheek—is minimal when compared to other methods of harvesting bodily tissues or fluids, and I acknowledge that, ordinarily, the level of intrusion focuses on the method by which the information is obtained. Given the massive amount of deeply personal information that is embodied in the DNA sample, however, it seems to me that a proper analysis of the level of intrusion needs to take that as well into account. A person's entire genetic makeup and history is forcibly seized and maintained in a government file, subject only to the law's direction that it not be improperly used and the prospect of a misdemeanor conviction if a custodian *willfully* discloses it in an unauthorized manner. No sanction is provided for if the information is non-willfully disclosed in an unauthorized manner, though the harm is essentially the same. The Court seems to believe that taking that consideration into account is illogical. To me, not considering it is, at best, unrealistic, and, at worst, less than honest.

I doubt as well the premise that the purpose for collecting this information is not to discover evidence of criminality but merely to establish identity. It is true, of course, that the DNA sample will be used to establish identity, but the principal purpose of establishing identity will be to provide evidence

of criminality, evidence that will allow the police to establish probable cause to collect precisely the same evidence for use in court. The foundation upon which these laws rest, and the invocation of *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) to sustain them, is that convicted criminals are more likely to have committed other crimes and are more likely to commit future crimes than the general population, and that collecting and storing their DNA will materially assist law enforcement agencies in solving crimes and perhaps deter those from whom the samples are taken from committing future crimes. In my view, it is, misleading even to suggest, much less hold, that this program is not designed for the predominant purpose of providing evidence of criminality. It clearly is.

I prefer to be more honest about the matter. All of the law enforcement and correctional statistics demonstrate that convicted criminals tend to be recidivists and that many, if not most, people in prison are not there for their first offense— that they have committed crimes, often unsolved ones, before committing the crime for which they are incarcerated and that they are far more likely to commit future crimes than the general population or any other definable group in the general population. As a group, defined by their own judicially-determined conduct, they *do* constitute a special potential threat to public safety, even while in prison and certainly after their release. As a group, defined by their own judicially-determined conduct, they have a much reduced expectation of privacy. They are routinely fingerprinted and photographed upon arrest, and those fingerprints and photographs are stored and used for much the same purpose as the DNA samples will be used. If any interview following arrest is taped, those tapes may be preserved and used later for voice or photo identification. While in prison, they are subject to random searches, and their letters and other communications may be limited or monitored; while on probation or parole, they may be required to submit to urine testing and other intrusive monitoring. If they have committed certain kinds of sex crimes, they may be required to register with police

authorities for years after being released from incarceration or probation. If they are not U.S. citizens, they may be subject to swift deportation.

As does Judge Raker in her concurring opinion, I see this really as resting on the same basis as the collection and storage of fingerprints or "mug shot" photographs. The collection of DNA is much more intrusive because of the information contained in the DNA, but DNA is also a much more reliable identifier and thus better serves the same governmental interest that justifies collecting fingerprints and photographs. That, to me, is where the balance is in terms of reasonableness.

BELL, Chief Judge, dissenting which HARRELL and GREENE, JJ., join.

In this case, we are asked, by the appellant, the State of Maryland, to determine "whether the suppression court err[ed] in ruling that the Maryland DNA Collection Act is unconstitutional as violative of the Fourth Amendment." [1] More specifically, the question is whether the Circuit Court for Montgomery County erred when, having found that the Maryland DNA Collection Act, Maryland Code (1994, 2003 Replacement Volume), § 2–501 et seq. of the Public Safety Article, was in violation of the Fourth Amendment to the United States Constitution, it granted the appellee's motion to suppress physical evidence in a first degree rape and robbery case. The majority concludes that it did. It holds "that the Maryland DNA Collection Act ... is constitutional and does not violate the Fourth Amendment or the Ex Post Facto Clauses of the United States and Maryland Constitutions."

---

1. Responding to the State of Maryland's petition for certiorari raising this question, the appellee, Charles Raines, filed a Conditional Cross Petition for Certiorari, presenting the question, "Did the suppression court err in ruling that the Maryland DNA collection statute was not a penal statute in violation of the ex post facto clauses of the federal and state constitutions, as applied to the appellee?" Although the majority reaches this question, affirming the trial court's ruling that the statute is not an ex post facto law, I do not, and need not, given my resolution of the question that the State raises.

*State of Maryland v. Charles Raines*, 383 Md. 1, 5, 857 A.2d 19, 21 (2004). It reasons, in summary,

> "[t]he [Maryland DNA Collection] Act's provisions allowing the State to obtain the DNA profile of a certain group of convicted persons to store in a DNA data base is reasonable, because the minimal physical intrusion on the inmate, a person with a diminished expectation of privacy, is outweighed by the legitimate governmental interest in identifying persons involved with crimes, including vindicating those falsely convicted."

*Id.* at 41–42, 857 A.2d at 43.

In arriving at this holding, the majority accepts the State's argument that the DNA collection act "is consistent with the Fourth amendment's totality of the circumstances test, which assesses the reasonableness of a Fourth Amendment intrusion by balancing the degree of the government's intrusion upon the individual's expectation of privacy against the promotion of the government's legitimate interest." *Id.* at 14–15, 857 A.2d at 27. Like the State, the majority characterizes the government intrusion in this case, the search—the buccal swab—as minimal, "as appellee, an incarcerated felon, had a diminished expectation of privacy," *id.* at 14–15, 857 A.2d at 27, and announces the legitimate government interest, which it characterizes as "properly identifying individuals and protecting the public," as having been "served." *Id.*

The majority relies on the reasoning of the Supreme Court in *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), the reasoning of the Fourth Circuit Court of Appeals in *Jones v. Murray*, 962 F.2d 302 (1992),[2] the fact

---

**2.** *Jones v. Murray*, 962 F.2d 302 (4th Cir.1992) predates *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) and *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), both of which, as we will see, reaffirmed the individualized suspicion requirement as a prerequisite for most searches and seizures. Indeed, *Edmond*, made a point of distinguishing *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), a sobriety checkpoint case, the existence of which the *Jones* court found quite significant. Acknowledging its checkpoint

that the overwhelming number of courts that have addressed the issue has upheld the constitutionality of DNA collection statutes and its "independent assessment" of the reasonableness of DNA collection searches. Interestingly, it purports not to address the State's alternative argument, that the statute passes muster under the "special needs" exception, as "collection of 'DNA from convicted offenders and storing their DNA profiles serve[ ] special law enforcement interests.' " *Id.*

I disagree and, guided by the traditional tenets of Fourth Amendment [3] jurisprudence, I dissent.

From the earliest days of search and seizure jurisprudence, it has been clear that, in its purest form, the Fourth Amendment mandates that no search of place, property or person or seizure, should be effectuated and no evidence resulting from such a search and seizure should be considered unless there has been a sufficient showing of a particularized and focused suspicion, amounting to probable cause, that the place or individual to be searched was involved in criminal activity. *Kyllo v. United States,* 533 U.S. 27, 31, 121 S.Ct. 2038, 2041, 150 L.Ed.2d 94, 100 (2001); *See Generally,* Wayne LaFave, *Search And Seizure: A Treatise On The Fourth Amendment,* 2 SEARCH & SEIZURE § 3.1(a). From its inception,

"the Fourth Amendment was the colonists' response to the unlimited intrusions by the British government into their

---

cases, including *Sitz* (involving a sobriety checkpoint aimed at removing drunk drivers from the road) and the suggestion in *Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) that a roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible, the Court nevertheless was emphatic: "In none of these cases . . . did we indicate approval of a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *City of Indianapolis v. Edmond,* 531 U.S. at 37–38, 121 S.Ct. at 451–52, 148 L.Ed.2d at 341 (2000).

**3.** The Fourth Amendment to the United States Constitution states:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized."

privacy in the 1700s. Using a Writ of Assistance, British customs officials were able to enter any home and search the premises for evidence of customs violations. These officials did not need 'to have particularized suspicions about any person or place before searching, nor were they required to justify their actions to any authority after the search.' The Framers found these unchecked governmental actions by the British unacceptable. To ensure that their new government would not have this type of arbitrary power, and to protect against the recurrence of these unchecked governmental actions, the Framers included the Fourth Amendment in the Bill of Rights, granting the right to be free from unreasonable searches and seizures."

*See* Denise Robinson, *Kaupp v. Texas: Breathing Life into the Fourth Amendment,* 94 J. CRIM. L. & CRIMINOLOGY 761 (Spring 2004).

This protection was, and continues to be, greatest with respect to the search of a private home. *United States v. Unites States Dist. Ct. for Eastern Dist. of Mich.,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed") "[A]t the very core of Fourth Amendment, 'stands the right of a [person] to retreat into [her] own home and there be free from unreasonable governmental intrusion.'" *Kyllo v. United States,* 533 U.S. at 31, 121 S.Ct. at 2041, 150 L.Ed.2d at 100, quoting *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734, 739 (1961). Undergirding, and forming the foundation for, this jealously guarded and rigid protection of private homes from governmental invasions without probable cause was the bedrock principle of the common law that there exists an " 'overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.'" *Oliver v. U.S.,* 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214, 224 (1984) quoting *Payton v. New York,* 445 U.S. 573, 601, 100 S.Ct. 1371, 1387, 63 L.Ed.2d 639, 660 (1980).

A citizen's privacy interests are not limited to his or her home, however. Rather, those interests extend to his or her person. As the Supreme Court observed in *Katz v. United States,*

> "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. *See Lewis v. United States,* 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 [, 315 (1966)]; *United States v. Lee,* 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202 [, 1204 (1927)]. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."

389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967). *See Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, 898–99 (1968), in which, quoting *Union Pac. R. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734, 737 (1891), the Supreme Court held that " '[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' "

To be sure, the Court, in some cases, has reformulated the probable cause standard, *see Camara v. Municipal Court,* 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930, 941 (1967) (holding that "[i]f a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant.") and *See v. City of Seattle,* 387 U.S. 541, 545, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943, 947 (1967) ("The agency's particular demand for access will of course be measured, in terms of probable cause to issue a warrant, against a flexible standard of reasonableness that takes into account the public need for effective enforcement of the particular regulation involved"), and has relaxed the probable

cause standard for searches,[4] in others, *see, e.g. Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1968) (holding that a limited search of the outer clothing of a suspect for weapons is reasonable where the officer has a reasonable articulable basis for believing that the suspect may be armed and presently dangerous); *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480–3481, 77 L.Ed.2d 1201, 1220 (1983) (holding that "search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts,

---

4. I note that the Supreme Court, in the border patrol checkpoint cases, has held that stops, hence seizures, were reasonable without the articulation of reasonable suspicion, when the stops were evenly enforced for every automobile that passed through the checkpoint, were minimally intrusive and there was a compelling need for those stops to stem the overwhelming tide of entry of illegal aliens into the country. *United States v. Martinez–Fuerte,* 428 U.S. 543, 562, 96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116, 1131–33 (1976) (recognizing that "traffic-checking [permanent checkpoints] program in the interior is necessary because the flow of illegal aliens cannot be controlled effectively at the border," and holding that, although checkpoint stops are seizures, as contemplated under the Fourth Amendment, because they involve only a brief detention, during which a question or two must be answered and documents produced, and neither the vehicle nor its occupants is searched, and visual inspection of the vehicle is limited to what can be seen without a search, the stops could be made in the absence of reasonable suspicion). Similarly, stops at sobriety checkpoints have been upheld in the absence of particularized and focused suspicion. *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 451, 110 S.Ct. 2481, 2485–86, 110 L.Ed.2d 412, 420–21 (1990) (holding that the "seizure" of motorists who were stopped at a sobriety checkpoint at which all vehicles were stopped, was reasonable without individualized suspicion in light of the magnitude of the drunk-driving problem and the determination of law enforcement officials that such checkpoints were necessary to apprehend such individuals before tragedy strikes). *But see United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607, 618 (1975) (holding that although roving patrols in which officers stop and question motorists about their resident status may be conducted without probable cause, such stops must, at least, show that the "stopping officer is 'aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that a vehicle contains illegal aliens who may be illegally in the country.").

reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons"); *Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276, 286 (1990) (holding "that as an incident to arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion [that persons were actually in the areas], look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched"); *United States v. Knights*, 534 U.S. 112, 121, 122 S.Ct. 587, 592, 151 L.Ed.2d 497, 506–507 (2001) (holding that "when an officer has reasonable suspicion that a probationer[, who is already] subject to a search condition [pursuant to his probation agreement,] is engaged in criminal activity, [then] there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's ... privacy interests is reasonable."). In still others, the Court has dispensed with the requirement for particularized and focused suspicion as a prerequisite for search.[5] *Board of Education v. Earls*, 536 U.S. 822, 829–30, 122 S.Ct. 2559, 2564–65, 153 L.Ed.2d 735, 744 (2002); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *Natl.Treasury Employees Union v.*

---

**5.** Although not involving a search, at best only a seizure, the Supreme Court recently addressed the "special needs" doctrine in *Illinois v. Lidster*, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004). The Court upheld the constitutionality of a roadblock checkpoint, which police set up to obtain information about an earlier hit-and-run accident. *Id.* at 427, 124 S.Ct. at 891, 157 L.Ed.2d at 853. Each car that approached the roadblock was stopped for 10–15 seconds, the passengers were provided with a flyer with information about the hit-and-run and asked if they knew anything about it. As the respondent approached the officers, he swerved his van, almost hitting an officer. He was arrested after the officer smelled alcohol on his breath and conducted a sobriety test. *Id.* at 422, 124 S.Ct. at 888, 157 L.Ed.2d at 849. The respondent challenged his arrest on the basis that the checkpoint violated his Fourth Amendment rights against illegal search and seizure. The Supreme Court disagreed, holding that "the stop's primary law enforcement purpose was not to determine whether a vehicle's occupants were committing a crime, but to ask vehicle occupants, as members of the public, for their help in providing information about a crime in all likelihood committed by others." *Id.* at 423, 124 S.Ct. at 889, 157 L.Ed.2d at 850.

*Von Raab*, 489 U.S. 656, 666, 109 S.Ct. 1384, 1391, 103 L.Ed.2d 685, 703 (1989); *Skinner v. Railway Labor Executives' Ass'n.* 489 U.S., 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

The cases in this latter category reflect the permissible exceptions to the Fourth Amendment requirements that the Supreme Court has recognized, those being "special" interests or needs searches,[6] undertaken to further some important and legitimate societal interest, other than the general interest in law enforcement. Reflective of such interests are random prison searches designed to ensure the security of penal institutions, *see Hudson*, at 529, 104 S.Ct. at 3202, 82 L.Ed.2d at 404–405,[7] random drug and alcohol testing in occupations directly impacting the public safety, ensuring public safety by

---

6. *Camara v. Municipal Court*, 387 U.S. 523, 538, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930, 941 (1967) and *See v. City of Seattle, supra*, 387 U.S. at 545, 87 S.Ct. at 1740, 18 L.Ed.2d at 943 may, in one sense, fall into this category, as well. In *Camara*, as the Court in *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116, 1130 (1976), explained, "the Court required an 'area' warrant to support the reasonableness of inspecting private residences within a particular area for building code violations, but recognized that 'specific knowledge of the condition of the particular dwelling' was not required to enter any given residence. . . . In so holding, the Court examined the government interests advanced to justify such routine intrusions 'upon the constitutionally protected interests of the private citizen' . . . and concluded that under the circumstances the government interests outweighed those of the private citizen." (quoting *Camara*, 387 U.S. at 538, 87 S.Ct. at 1727, 18 L.Ed.2d at 941.)

7. The Court, in *Hudson v. Palmer*, 468 U.S. 517, 529, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393, 405 (1984), explained why no particularized suspicion was required for such searches:

"prison searches [that] must be conducted only . . . when suspicion is directed at a particular inmate is to ignore the realities of prison operation. Random searches of inmates, individually or collectively, and their cells and lockers are valid and necessary to ensure the security of the institution and the safety of inmates and all others within its boundaries. This type of search allows prison officers flexibility and prevents inmates from anticipating, and thereby thwarting, a search for contraband."

regulating certain occupations,[8] *Von Raab*, 489 U.S. at 679, 109 S.Ct. at 1398, 103 L.Ed.2d at 710–711 (holding reasonable a U.S. Customs regulation requiring urine testing of all employees who applied for a promotion that required the carrying of a gun and involvement with drug interdiction, given that the "government's compelling interest in safeguarding borders and public safety outweighed diminished privacy expectation"); *Skinner*, 489 U.S. at 634, 109 S.Ct. at 1422, 103 L.Ed.2d at 670–71 (holding railroad regulation requiring random drug testing without particularized suspicion to be reasonable in light of connection to public safety); drug testing of students, *Earls*, 536 U.S. at 824, 122 S.Ct. at 2559, 153 L.Ed.2d at 744 (urine testing of students engaged in extracurricular activities to prevent health and safety risks of drug use); *Vernonia School Dist. 47J*, 515 U.S. at 661–64, 115 S.Ct. at 2394–2396, 132 L.Ed.2d at 579–82 (holding that school district's requirement that all students who wished to participate in interscholastic sports submit to random urinalysis testing was reasonable in light of the overwhelming interest in ensuring that youth are drug free).

These changes do not indicate, however, that the Court has abandoned the requirement that most searches be justified by some level of particularized or focused suspicion or that suspicionless searches are the rule whenever the intrusion occasioned by the search is "minimal" and justified by a law enforcement purpose or purposes. On the contrary, two recent cases make clear the Supreme Court's position with respect to suspicionless searches for general criminal law enforcement purposes.

---

**8.** In *Chandler v. Miller*, 520 U.S. 305, 318–322, 117 S.Ct. 1295, 1303–1305, 137 L.Ed.2d 513, 525–28 (1997), the Court declined to hold that a Georgia statute that mandated that candidates for elected office pass a drug test asserted a special need akin to the drug testing for the employees in *Skinner*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), noting that the railroad employees directly affected public safety, but that, because it was unlikely that the statute was sufficiently tailored to accomplish the goal of having drug-free political representatives, it amounted to a symbolic statute which was an insufficient government interest when weighed against privacy rights.

In *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), the Court considered the constitutionality of an automobile checkpoint program set up to discover and interdict illegal drugs. At the checkpoint, officers stopped a predetermined number of vehicles, and, with each stop, one officer approached the vehicle, explained that it was being stopped at a drug checkpoint and asked for license and registration. *Id.* at 35, 121 S.Ct. at 450, 148 L.Ed.2d at 339. While the officer looked for signs of impairment and conducted an open view examination, a narcotics-sniffing dog was walked around the outside of each car. *Id.* at 35, 121 S.Ct. at 450–51, 148 L.Ed.2d at 339. Although acknowledging that "the sniff by a dog that simply walks around a car is 'much less intrusive than a typical search,'" *id.* at 40, 121 S.Ct. at 453, 148 L.Ed.2d at 343, quoting *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110, 121 (1983), after noting the usual rule—"[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing," *id.* at 37, 121 S.Ct. at 451, 148 L.Ed.2d at 340 (citing *Chandler v. Miller,* 520 U.S. 305, 308, 117 S.Ct. 1295, 1298, 137 L.Ed.2d 513, 519 (1997))—and reviewing the "only limited circumstances in which the usual rule does not apply,"[9] *id.,* the Court nevertheless held that the seizure in that

---

**9.** Those exceptions were delineated by the Court, as follows:

"While such suspicion is not an "irreducible" component of reasonableness, *Martinez–Fuerte,* 428 U.S. at 561, 96 S.Ct. 3074, we have recognized only limited circumstances in which the usual rule does not apply. For example, we have upheld certain regimes of suspicionless searches where the program was designed to serve "special needs, beyond the normal need for law enforcement." *See, e.g., Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (random drug testing of student-athletes); [Nat.] *Treasury Employees [Union] v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (drug tests for United States Customs Service employees seeking transfer or promotion to certain positions); *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (drug and alcohol tests for railway employees involved in train accidents or found to be in violation of particular safety regulations). We have also allowed searches for certain administrative purposes without particularized suspicion of misconduct, provided that those searches are appropri-

case was not carried out pursuant to a legitimate special governmental need, but, rather, served as a mask for detecting evidence of criminal wrongdoing. The Court explained:

"We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion. We suggested in *Prouse* that we would not credit the 'general interest in crime control' as justification for a regime of suspicionless stops. Consistent with this suggestion, each of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety. Because the primary purpose of the Indianapolis narcotics checkpoint program is

ately limited. *See, e.g., New York v. Burger,* 482 U.S. 691, 702–704, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (warrantless administrative inspection of premises of "closely regulated" business); *Michigan v. Tyler,* 436 U.S. 499, 507–509, 511–512, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (administrative inspection of fire-damaged premises to determine cause of blaze); *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 534–539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (administrative inspection to ensure compliance with city housing code).

"We have also upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens, *Martinez–Fuerte, supra,* and at a sobriety checkpoint aimed at removing drunk drivers from the road, *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In addition, in *Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), we suggested that a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible. In none of these cases, however, did we indicate approval of a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing."

*City of Indianapolis v. Edmond,* 531 U.S. 32, 37–38, 121 S.Ct. 447, 451–52, 148 L.Ed.2d 333, 340–41 (2000).

to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment."

*Id.* at 41–42, 121 S.Ct. at 454, 148 L.Ed.2d at 343.

The Court rejected an argument that the checkpoint at issue in *Edmond* had the same "ultimate purpose" as the roadblocks previously upheld, to arrest those suspected of committing crimes. On that point, the Court explained:

"If we were to rest the case at this high level of generality, there would be little check on the ability of the authorities to construct roadblocks for almost any conceivable law enforcement purpose. Without drawing the line at road-blocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life."

*Id.* at 42, 121 S.Ct. at 454, 148 L.Ed.2d at 344. Finally, the Court was clear, the gravity of the threat alone may not define the means that may be used to pursue a given purpose. "Rather," it asserted,

"in determining whether individualized suspicion is required, we must consider the nature of the interests threatened and their connection to the particular law enforcement practices at issue. We are particularly reluctant to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends."

*Id.* at 42–43, 121 S.Ct. at 454–55. 148 L.Ed.2d at 344.

This approach and rationale was reiterated and reconfirmed in *Ferguson v. City of Charleston,* 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). In that case, the Court held unconstitutional a hospital policy that tested the urine of pregnant women for illegal drugs, the positive results of which were provided to prosecutors for use in criminal prosecutions. *Id.* at 84–86, 121 S.Ct. at 1292–93, 149 L.Ed.2d at 220–221. In so holding, the Court noted that the searches of the women involved were based neither on "probable cause to believe that they were using cocaine [nor] even the basis for a reasonable

suspicion of such use [of cocaine]." *Id.* at 76, 121 S.Ct. at 1287–88, 149 L.Ed.2d at 215. The Court declined to accept the City's argument that "protecting of the mother and child" served a beneficent purpose, when "it . . . [was] clear from the record that an initial and continuing focus of the policy was on the arrest and prosecution." *Id.* at 82, 121 S.Ct. at 1290, 149 L.Ed.2d at 219 (citation omitted).[10] To that end, the Court reasoned that:

> "[w]hile the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off drugs, the immediate objective of the searches was to generate evidence for law enforcement purposes, in order to reach that goal. The threat of law enforcement may ultimately have been intended as a means to an end, but the direct and primary purpose of [the] policy was to ensure the use of those means. In our opinion this distinction is critical. Because law enforcement involvement always serves some broader social purpose or objective, under respondents' view, virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate rather than immediate purpose. Such an approach is inconsistent with the Fourth Amendment."

*Id.* at 82–84, 121 S.Ct. at 1291–92, 149 L.Ed.2d at 219–20.

The majority disclaims any reliance on "special needs" cases, maintaining that such reliance is unnecessary. Moreover, it does not contend that there is particular or articulable reason to suspect the respondent or, indeed, any of the convicted felons subject to the DNA collection statute, of engaging in any wrongdoing other than that for which he has, or they have, been convicted. And the statute does not contain, or make, findings that would substitute for such individualized and focused suspicion. Rather, the majority

---

10. The Court noted that "[n]owhere . . . does the document discuss different courses of medical treatment for either mother or infant, aside from treatment for the mother's addiction." *Ferguson v. City of Charleston*, 532 U.S. 67, 82, 121 S.Ct. 1281, 1291, 149 L.Ed.2d 205, 219 (2001).

relies on a kind of, as the respondent characterizes it, "free floating 'totality of the circumstances' balancing test of the sort employed in the 'special needs' line of cases" to sustain the constitutionality of the DNA collection act. The balance that it posits as applicable to the determination of the reasonableness of the subject search pits the diminished expectation of privacy of a convicted felon against the legitimate government interest of "identifying persons" and more specifically, the majority submits, "in establishing a more accurate method to identify recidivists for several purposes." 383 Md. at 17–18, 857 A.2d at 28–29.

Because, as we have seen, the majority has determined that the intrusion occasioned by the search is minimal—taking a buccal swab of the cheek takes only a few seconds, it reasons—the majority concludes that the balance favors the government interest.

The balance is free floating because there is no context to the expectation of privacy prong; apparently, there are no limits to it. Furthermore, the purpose posited for why the exploitation of that diminished expectation of privacy is proper bears no relation to the respondent's status as a convicted felon or to the penal institution's ability safely and effectively to house him. Authority for this balancing test, the majority finds in *Knights, supra.*

*Knights* does not stand for the proposition for which the majority cites it. In that case, Knights, the respondent, was on probation for a drug offense. As a condition of probation, Knights agreed to a provision in his release contract which stated that he "submit[s] his ... person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." 534 U.S. at 114, 122 S.Ct. at 588, 151 L.Ed.2d at 502. Shortly after he was placed on probation, Knights and an associate, Simoneau, were linked to several arsons involving Pacific Gas and Electric (PG & E) property. Having surveilled Knights and his co-conspirator, during the course of which he observed

Knights in possession of what appeared to be several pipe bombs and observed some suspicious objects, including a Molotov cocktail, two brass padlocks reported stolen from the PG & E property that had been set on fire, and a gasoline can, in Simoneau's truck while it was parked outside of Knights's apartment, *id.* at 115, 122 S.Ct. at 589, 151 L.Ed.2d at 502–503, and aware of the search provision in Knights's probation order, a detective searched Knights's apartment, uncovering substantial evidence that Knights had been involved in setting the fires.[11]

Knights was arrested and subsequently indicted for conspiracy to commit arson, possession of an unregistered destructive device and for being a felon in possession of ammunition. In his pre-trial motion to suppress the evidence seized in the search, Knights argued that the search was an illegal one. *Id.* at 116, 122 S.Ct. at 590, 151 L.Ed.2d at 503. Although the United States District Court for the Northern District of California held that the detective had reasonable suspicion that Knights was involved with incendiary devices, it nevertheless granted the motion to suppress on the ground that the search was for "investigatory" rather that probationary purposes. *Id.* The Ninth Circuit Court of Appeals affirmed, relying on its earlier decision in *United States v. Ooley,* 116 F.3d 370 (9th Cir.1997), in which it held that a search condition in a probation order "must be seen as limited to probation searches, and must stop short of investigation searches." *Id.* This holding being at odds with California precedent, which held that the probation condition at issue drew no distinction between probationary searches and investigatory searches, the United States Supreme Court granted certiorari "to assess the constitutionality of searches made pursuant to this common California probation condition." *Id.*

---

11. Those items included, "a detonation cord, ammunition, liquid chemicals, bolt cutters telephone pole-climbing spurs, drug paraphernalia, and a brass padlock stamped 'PG & E.'" *United States v. Knights,* 534 U.S. 112, 115, 122 S.Ct. 587, 589, 151 L.Ed.2d 497, 503 (2001).

After establishing the correct mode of analysis, namely, to balance the privacy interests of the respondent with legitimate government interests, the Court acknowledged that Knights's status as a probationer was integral to both prongs of the analysis. First, the Court held that probationers have a lower expectation of privacy by virtue of their involvement with the criminal system. On that point, the Court stated:

"Probation, like incarceration, is a form of criminal sanction imposed by 'a court upon an offender after verdict, finding or plea of guilty.'" *Griffin [v. Wisconsin*, 483 U.S. 868,] 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (quoting G. Killinger, H. Kerper, & P. Cromwell, *Probation and Parole in the Criminal Justice System* 14 (1976)). Probation is "one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service[.]" 483 U.S. at 874, 107 S.Ct. 3164, 97 L.Ed.2d 709. Inherent in the very nature of probation is that probationers "do not enjoy the absolute liberty to which every citizen is entitled. . . . Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens."

*Knights*, 534 U.S. at 119, 122 S.Ct. at 591, 151 L.Ed.2d at 505. (some citations omitted). The Court took notice that, in that case, the petitioner's expectation of privacy was significantly diminished because "[t]he probation order clearly expressed the search condition and Knights was unambiguously informed of it," *id.* at 119, 122 S.Ct. at 592, 151 L.Ed.2d at 505; he was on notice that his probation agreement included a condition allowing law enforcement officials to search his premises without notice.

With respect to the government interest side of the balance, the Court observed that the government's "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id.* at 121, 122 S.Ct. at 592, 151 L.Ed.2d at 506. This is so, it

pointed out, because "it must be remembered that 'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.'" *Id.* at 120, 122 S.Ct. at 592, 151 L.Ed.2d at 506, quoting *Griffin v. Wisconsin,* 483 U.S. 868, 880, 107 S.Ct. 3164, 3172, 97 L.Ed.2d 709, 721 (1987).

Given the lowered expectation of privacy, the Court held that, rather than the usual requirement of probable cause, all that was necessary for the search in that case was reasonable suspicion. *Id.* at 121, 122 S.Ct. at 592–93, 151 L.Ed.2d at 507. More particularly, the Court explained:

> "We hold that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house. The degree of individualized suspicion required of a search is a determination of which there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interests reasonable. *See United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (individualized suspicion deals 'with probabilities'). Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable.... Those interests warrant a lesser than probable-cause standard here. When an officer has reasonable suspicion that the probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."

*Id.* at 121, 122 S.Ct. at 592–93, 151 L.Ed.2d at 506–507 (some citations omitted).

Having so held, despite the fact that, by its terms, the probation condition permitted a suspicionless search, the Court did not decide "whether the probation condition so diminished, or completely eliminated Knights's reasonable expectation of privacy (or constituted consent ...) that a search

by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment." *Id.* at 120 n. 6, 122 S.Ct. at 592 n. 6, 151 L.Ed.2d at 505 n. 6.

As indicated, the majority's reasonableness analysis relies on the reasoning in *Knights.* It finds particularly instructive the Court's recognition that probationers, in certain circumstances, enjoy a lesser expectation of privacy. Building on that premise, it reaches the conclusion that prisoners who are incarcerated, such as the respondent in this case, enjoy even a more diminished expectation of privacy—so much so, in fact, that the usual requirement of an individualized and articulable basis for a search of such persons, consistent with the Fourth Amendment, does not apply. In this regard, the majority places great emphasis on the fact that the search in *Knights* was of a home, rather than, as here, a buccal swab of the respondent's cheek. Thus, it reminds us that *"Knights* dealt with an intrusion that has long been held to be 'the chief evil against which the wording of the Fourth Amendment is directed'—the search of a private home." 383 Md. at 16–18, 857 A.2d at 28–29 (quoting *United States v. United States Dist. Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1972)).

The majority then contrasts the level of expectation of privacy Knights could expect to enjoy in his own home and the much lower expectation of privacy enjoyed by incarcerated inmates, concluding that, in the context of prison, the expectation of privacy is so low, when weighed against the "minimal" intrusion of a buccal swab (which I shall address later), that it is negligible: "Here, appellee was not on probation living in his own home—he was incarcerated. The government intrusion was not an unauthorized entry into a private home, but a buccal swab of the cheek lasting a few seconds." 383 Md. at 17–18, 857 A.2d at 28–29. The majority's analysis misses the point and is significantly flawed.

*Knights* is not a suspicionless search case. On the contrary, as the Court took pains to point out, the detective had a

reasonable suspicion that the probationer, Knights, was engaged in wrong-doing and it was that suspicion that prompted the surveillance and ultimately the search of the apartment. The issue that had to be resolved was whether a probation provision that was a condition of probation, permitting a search of the probationer's home with or without a warrant and with or without cause, provided sufficient indicia of reasonableness to render the warrantless search constitutional. Stated differently, the issue presented to the Court for resolution involved determining the standard that would apply to justify the warrantless search of the home of a probationer, a condition of whose probation permitted such a search. That is the way the Supreme Court analyzed the case and decided it, concluding, after balancing the interests of the respondent and the State, that the search was reasonable. Inexplicably, the majority fails to do so and, instead, analyzes the case as if the Supreme Court had decided the question that that Court expressly did not decide. *See* 534 U.S. at 120 n. 6, 122 S.Ct. at 592 n. 6, 151 L.Ed.2d at 505 n. 6.

Significantly, in making the balance in *Knights,* the Supreme Court provided guidance as to the relationship that must exist between the two sides of the balance. It is to be recalled that the Court indicated that the respondent's status as a probationer informed both sides of the balance, thus providing a context for the expectation of privacy; it must be assessed in light of the competing interest of the government. The *Knights* Court analyzed the relationship it identified between the expectation of privacy of a probationer and the government interest in apprehending criminals,—that relationship is especially significant when a condition of probation is that the probationer himself obey all laws and not commit criminal violations—and struck the balance in favor of the government.

In this case, the majority does not address whether there is any relationship between the expectation of privacy of the respondent and the State interest sought to be served by the DNA collection, and, if so, what that relationship is and how it impacts each of the interests. Certainly, there is no "legiti-

mate penological interest," *Turner v. Safley*, 482 U.S. at 89, 107 S.Ct. at 2261, 96 L.Ed.2d at 79, served by the collection of DNA from convicted and incarcerated felons, for the benefit of which those felons' privacy expectations must be subordinated. The collection of DNA simply is not necessary in the interest of the effective prison administration or internal security. *See Bell v. Wolfish*, 441 U.S. at 546–547, 99 S.Ct. at 1878, 60 L.Ed.2d at 473. Even if the reason for taking the buccal swab were identification, as the majority urges, and not to obtain evidence and, thus, it is not a part of the State's general interest in detecting crime, it still would not provide justification for the search, since even that purpose would not provide justification for the search in the prison context. It is not surprising, therefore, that the majority does not pursue the "special needs" rationale.

But I do not believe that the search passes constitutional muster even if the majority's totality of the circumstances balancing test analysis were sound. It is simply wrong to say that the interest being served by the search is identification. That is belied, in fact, by the statute itself. Maryland Code (2003) § 2–505 of the Public Safety Article makes crystal clear that the purpose of the DNA collection statute is to "database" DNA for use in solving crimes, those earlier committed as well as those that may be committed in the future. It provides:

" § 2–505. *Purpose of collecting and testing DNA samples.*

"(a) *In general.*—To the extent fiscal resources are available, DNA samples shall be collected and tested:

(1) to analyze and type the genetic markers contained in or derived from the DNA samples;

(2) as part of an official investigation into a crime;

(3) to help identify human remains;

(4) to help identify missing individuals; and

(5) for research and administrative purposes, including:

(i) development of a population data base after personal identifying information is removed;

(ii) support of identification research and protocol development of forensic DNA analysis methods; and

(iii) quality control.

"(b) *Limitations on DNA records.*—(1) Only DNA records that directly relate to the identification of individuals shall be collected and stored.

(2) DNA records may not be used for any purposes other than those specified in this subtitle."

In addition, the State does not deny, and in fact admits, that the immediate and primary purpose of the act is the "public interest in prosecuting crimes more accurately" and it maintains that the act "assist[s] more effectively in investigations of crimes likely to involve DNA than some other DNA laws, because the Maryland law covers a broader range of offenders." Moreover, the candor of Judges Raker and Wilner on this point, expressed in their concurring opinions in this case, *see* 383 Md. at 43–45, 50–51, 857 A.2d at 44–45, 49 (Raker, J. and Wilner, J., concurring), is refreshing and absolutely on the money. Judge Wilner states it thus:

"I doubt as well the premise that the purpose for collecting this information is not to discover evidence of criminality but merely to establish identity. It is true, of course, that the DNA sample will be used to establish identity, but the principal purpose of establishing identity will be to provide evidence of criminality, evidence that will allow the police to establish probable cause to collect precisely the same evidence for use in court. The foundation upon which these laws rest, and the invocation of *United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) to sustain them, is that convicted criminals are more likely to have committed other crimes and are more likely to commit future crimes than the general population, and that collecting and storing their DNA will materially assist law enforcement agencies in solving crimes and perhaps deter those from whom the samples are taken from committing future crimes. In my view, it is, at best, misleading even to suggest, much less hold, that this program is not designed

for the predominant purpose of providing evidence of criminality. It clearly is."

*Id.* at 50–51, 857 A.2d at 49 (Wilner, J. concurring).

I reject, as disingenuous the argument that the act "does not constitute the gathering of direct evidence of a crime." As the majority points out, what is contemplated is that the act "serves to identify the perpetrator similar to the way investigators have used fingerprints for many years." Whether direct evidence or not, that use of the identification is itself evidence, as will become even more evident when it is introduced as such in the perpetrator's trial.

In determining that the search is reasonable, the majority also characterizes as minimally intrusive the buccal swab required to collect the DNA sample. *Raines*, at 18–19, 39, 857 A.2d at 29, 41–42. The DNA sample, moreover, the majority states, amounts to a simple identification technique akin to fingerprints. *Id.* at 35–36, 857 A.2d at 39–40. I am not persuaded.

Although the intrusion of a buccal swab may be minimal in a physical sense, it certainly is great when the vast amount of personal and private information DNA contains is considered. As was recently explained:

"While the DNA profile is often referred to as a type of genetic 'fingerprint,' this analogy is far too simplistic. Although current profiling methods utilize only limited amounts of genetic information, with the mapping of the human genome now underway, future DNA analysis may soon reveal an individual's medical history; proclivity toward certain diseases; and hereditary information such as race, physical, and behavioral traits. Thus, biological samples ... have the potential to reveal far more intimate information about the individual donor than a simple fingerprint.... Unlike an individual's fingerprint, which use is limited to identification, information potentially contained in a DNA profile may subject an individual to embarrassment, humiliation, public hostility, and even financial harm."

Jeffrey S. Grand, *The Blooding of America: Privacy and the DNA Dragnet,* 23 CARDOZO L. REV. 2277 (2002). In light of the heightened sensitivity of the information available through DNA analysis, as contrasted with fingerprinting, I find the search in this case highly intrusive. Unlike fingerprints, which contain all of the useable identifying information at the time the prints are taken, the DNA search does not end with the swab. To the contrary, the swab is then subjected to scientific tests, which may extract very sensitive, personal, and potentially humiliating information.

Regardless of how physically intrusive the DNA swab is, the fact of the matter is that the State has not sufficiently established that there is any individualized basis for the search, probable cause or some appropriate level of suspicion, that would justify any intrusion upon the respondent's constitutionally-protected privacy interest in his own body. Neither has the majority identified a government interest sufficient to override the respondent's privacy interest.

Judges Raker and Wilner recognize that this is so and are troubled by it. Nevertheless, because, as Judge Wilner puts it, "[a]s a group, defined by their own judicially-determined conduct, [Convicted felons] do constitute a special threat to public safety, even while in prison and certainly after their release," 383 Md. at 51–52, 857 A.2d at 49 (Wilner, J. concurring), they overlook the absence of a legitimate State interest and the absence of any individualized focus, choosing instead to treat the information gathering as akin to "the collection and storage of fingerprints" [12] or "mug shot" photographs. *Id.*

---

12. To the extent that the comparison is made to fingerprints, while their purposes may indeed overlap, there is a difference in kind between the collection of fingerprint data and DNA. For the collection of fingerprints, there is no invasion of the body, but with DNA collection such an invasion most assuredly occurs. And, of course, the information fingerprints convey is obtained, and exhausted, when the prints are taken. Moreover, fingerprints are taken, as a matter of course, from anyone arrested and thus required to be booked, as a means of identification of all of those persons. There are no distinctions drawn based on the crime committed, whether there is a conviction or the degree of the threat that the person is perceived to represent, now or in

at 51–52, 857 A.2d at 49. That the DNA is more reliable serves as the apology for its more intrusiveness. In short, it seems that to Judges Raker and Wilner, the ends really justify the means.[13]

It must be conceded that a DNA database may be, indeed, already has demonstrated that it may be a valuable tool for solving crimes that otherwise would be difficult of solution or would not be solved and could be a boon to those falsely accused, by exonerating them, as it has been to some already. That does not, however, answer the constitutional question. Undoubtedly, there are many crime fighting tools that, if allowed to be used, without restraint or with minimal over-sight and unrestrained by the Fourth Amendment, would prove quite effective in detecting and solving crime, yet would wreak havoc with constitutional rights, even of inmates. It is for that reason that throughout the history of the Fourth

the future. Thus, the fact that fingerprints might later prove to be strong, even dispositive, evidence against a defendant in an unrelated case is really incidental to, not the purpose of, their being taken. When, however, fingerprints are not obtained as a part of the normal booking procedure, there certainly is, and necessarily has to be, some individualized basis for seeking them. That is decidedly not the case with respect to DNA collection pursuant to the act.

13. It is interesting that one of the reasons the majority, (note the reliance on *Jones v. Murray*), and Judges Raker and Wilner, would uphold the DNA collection statute is because of the threat to the public that some convicted felons pose. That is recognition on their part that, to some extent, there must be a basis that is specific to the person that justifies the collection. Rather than focusing on each individual convicted felon, however, they lump them all together by holding that an amorphous and ill-defined suspicion of a group suffices. This is reminiscent of the general warrant, one that fails sufficiently to specify the place or person to be searched or the things to be seized, thus authorizing a random or blanket search, *see Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *State v. Siegel*, 266 Md. 256, 261, 292 A.2d 86, 89 (1972); *see also* Article 26 of the Maryland Declaration of Rights ("That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."), and the writ of assistance, making an already scary scenario even scarier.

Amendment, considerable efforts have been made to strike a balance between the State's law enforcement goals and the constitutional rights of the individual citizen. *See* Wayne LaFave, *Search And Seizure: A Treatise On The Fourth Amendment*, 2 SEARCH & SEIZURE § 3.1(a) (3d ed.) (2004); *see also* Joseph D. Grano, *Probable Cause and Common Sense: A Reply to the Critics of Illinois v. Gates*, 17 U. MICH. J.L. REF. 465, 478–95 (1984); Weber, *The Birth of Probable Cause*, 11 ANGLO-AMERICAN L.REV. 155 (1982). Surely the framers wanted law enforcement to operate in an effective and efficient manner; however, they were wise enough not to adopt a "by any means necessary" stance. In fact, the means and limitations which law enforcement utilized to enforce the law did not, and do not, "just matter," they became, and remain, key to any well-thought-out legal analysis and correct exposition of the law regarding the Fourth Amendment.

I am also reminded of the wise counsel of Mr. Justice Brandeis, given in a similar vein within the context of an illegal wiretap:

"[I]t is . . . immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."

*Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944, 957 (1928) (Brandeis, J. dissenting).

I dissent.

Judges HARRELL and GREENE join in the views expressed herein.